[No. D016667. Fourth Dist., Div. One. Mar. 24, 1994.]

KAREN JURAN, Plaintiff and Appellant, v.
DAVID EPSTEIN, Defendant and Respondent.

**COUNSEL**

Singer & Crawford, Elvi J. Olesen and David P. Crawford for Plaintiff and Appellant.

Duckor & Spradling, John C. Wynne and Robin A. Wofford for Defendant and Respondent.

**OPINION**

**NARES, J.**—Plaintiff Karen Juran (Karen) brought this action against her stepfather, defendant David Epstein (David). Karen alleged David breached an oral agreement by revoking a 1985 will he executed while Karen's mother, Charlotte Epstein (Charlotte), was alive. David successfully moved for summary judgment pursuant to Probate Code section 150.[1] Karen appeals. We reverse the judgment, determining there are triable issues of fact as to the existence of the alleged oral agreement and as to whether David is estopped from asserting that the absence of a writing rendered the agreement unenforceable.

## FACTUAL BACKGROUND

David married Charlotte in 1962. At the time of the marriage, Charlotte had three children from a previous marriage—Karen and two sons (Joseph

---

[1]Probate Code section 150 provides:

"(a) A contract to make a will or devise, or not to revoke a will or devise . . . if made after December 31, 1984, can be established only by one of the following:

"(1) Provisions of a will stating material provisions of the contract.

"(2) An express reference in a will to a contract and extrinsic evidence proving the terms of the contract.

"(3) A writing signed by the decedent evidencing the contract.

"(b) The execution of a joint will or mutual wills does not create a presumption of a contract not to revoke the will or wills.

"(c) A contract to make a will or devise, or not to revoke a will or devise, or to die intestate, if made on or before December 31, 1984, can be established only under the law applicable to the contract on December 31, 1984."

All further statutory references are to the Probate Code unless otherwise specified.

and Geoffrey). David had one child—Sharon Epstein. In 1965, David and Charlotte purchased a home in La Mesa. Although they initially took title as joint tenants, the couple later executed documents to hold title as community property. Throughout their marriage Charlotte and David were financially supported primarily by Charlotte's assets, derived from Charlotte's former husband.

In 1980, David and Charlotte each executed mutual wills, leaving everything to each other. Each will stated that if their spouse predeceased them, the estate (except for certain minor bequests) should be divided equally among Sharon, Geoffrey and Karen. In 1985, the couple executed new wills primarily because they wanted to exclude Geoffrey as a beneficiary, believing he had sufficient assets. In their new wills, Charlotte and David again left everything to the survivor between them, then equally to Sharon and Karen.

Charlotte died on December 10, 1990. Her estate consisted of her community property interest in the La Mesa house, and various items of personal property. Pursuant to Charlotte's will, David was the sole beneficiary of Charlotte's estate. Two months later, David revoked his 1985 will and executed a new will, leaving everything to Sharon.

Karen sued David, alleging he breached his oral contract with Charlotte "to leave their entire estate to the surviving spouse on the condition that the survivor would bequeath the entire estate equally between [Sharon] and [Karen]." Karen sought damages or alternatively, the imposition of a constructive trust on one-half the value of Charlotte's estate at the time of her death.

Moving for summary judgment, David asserted he and Charlotte had never entered into a written or oral agreement not to revoke their 1985 wills. In support of the motion, David submitted his own declaration stating that although he and Charlotte executed "identical wills," they never "discuss[ed] whether either of us would have the right to change our will after the death of the other. Therefore, since we never even discussed it, obviously, Charlotte and I never agreed that neither of us would have the right to change our will after the death of the other. I understood that Charlotte was free to change her will if I predeceased her. I further understood that I was free to change my will if she pre-deceased [*sic*] me."

In opposing the summary judgment, Karen offered several items of evidence in an attempt to show Charlotte and David had agreed not to revoke their 1985 wills. First, she proffered David's deposition testimony, wherein

David admitted that he and Charlotte had agreed when they executed their 1985 wills that they wanted their daughters to be treated equally with respect to the remaining assets of the estate after both he and Charlotte had died.[2] Next, Karen proffered two letters written by Charlotte pertaining to aspects of her estate plan. (See *post*, at pp. 890-891.) Third, Karen submitted her own declaration and the declarations of two of Charlotte's close friends, Mickey Pearson and Rebecca Hill, reflecting conversations in which Charlotte had said she and David had agreed that their survivor would leave one-half of the remaining estate to each of their daughters.[3]

---

[2]David testified at his deposition as follows:

"Q. Was it still your intention at the time you and Charlotte executed . . . the '85 wills, to first give everything to each other?

" . . . . . . . . . . . . . . . . . . . . .

" . . . And only then make some specific gifts and then give the residue to your kids?

"A That was the general principle, yes.

"Q. Is it fair to say the only real change between 1980 and '85 are some of the specific items, . . . and . . . the exclusion of Geoffrey because he already had sufficient assets?

"A I would say basically. It seems, though, there was something else wasn't there?

"Q. But you didn't change giving everything to each other first and then—

"A. Then the residue—

"Q. —to at least the two kids?

"A That's right.

"Q. Was that something you and Charlotte discussed between yourselves?

"A. Well, I wouldn't say 'discussed.' We agreed we would leave everything else alone.

"Q. 'Leaving everything else alone' meant you would give the property first to the survivor and then the remainder to Karen and Sharon and equally?

"A. Uh-huh, that's right.

"Q. And I believe it was Patricia Mason was the attorney that prepared these.

"A. Right.

"Q. And did you both communicate that to Ms. Mason, that that was your intention?

"A. Yes.

"Q. Did you and Charlotte discuss the fact that you wanted Karen and Sharon to be treated equally with the remaining assets of your estate after you were both gone?

" . . . . . . . . . . . . . . . . . .

"The Witness: I would say yes.

"Q. And in preparing the wills and executing the wills, you were carrying out that understanding between the two of you.

" . . . . . . . . . . . . . . . . . . . . . . .

"A. Yes.

"Q. —And signing them, you were carrying out that understanding between the two of you?

"A. Yes.

"Q. Did you and Charlotte discuss and agree that this was a fair way to treat your respective children? My question really goes to fairness. Did you discuss that? You both agreed that this was a fair way to handle the matter?

"A. We agreed that that would be a fair distribution, yes."

[3]Karen's declaration provided: "During the spring of 1989 . . . my mother . . . sat me down and explained the agreement she and David entered into regarding the disposition of their estate . . . . My mother . . . explained that she and David had . . . agreed that it was fair to have an equal distribution between [Karen] and [Sharon]. As a result thereof, my

After examining the summary judgment papers and considering the parties' arguments, the court granted David's summary judgment motion on the grounds that (1) Karen failed to come forward with written evidence that David had agreed not to revoke his will (§ 150, subd. (a)); and (2) section 150, subdivision (a) precluded it from enforcing a purported oral agreement on an equitable estoppel doctrine.

## DISCUSSION

 A person may make a valid agreement binding himself to make a disposition by will and a third party beneficiary may enforce such agreement. (See *Brown* v. *Superior Court* (1949) 34 Cal.2d 559, 563-565 [212 P.2d 878]; *Stahmer* v. *Schley* (1979) 96 Cal.App.3d 200, 203 [157 Cal.Rptr. 756].) The question in this case is whether there was evidence, sufficient to overcome a summary judgment motion, showing that David had agreed to bind himself to his 1985 will.

I

*Section 150, Subdivision (a)*

Section 150, subdivision (a) states a party may establish a contract not to revoke a will only through one of three forms of proof: "(1) Provisions of a will stating material provisions of the contract. [¶] (2) An express reference in a will to a contract and extrinsic evidence proving the terms of the contract. [¶] (3) A writing signed by the decedent evidencing the contract." (§ 150, subd. (a); see *ante*, p. 886, fn. 1.)

 Karen admits neither Charlotte's nor David's 1985 will contains a provision reflecting an agreement not to revoke the will and therefore she

mother explained to me that they agreed each of their Wills would give everything first to each other with the survivor dividing the estate equally between Sharon [ ] and myself upon his or her death."

Pearson similarly stated: "Charlotte discussed with me her will and the agreements she had entered into with her husband, David [ ] on numerous occasions. According to Charlotte, she and . . . David had made an agreement to dispose of their estate jointly through identical wills whereby each would give their property first to the other and then the survivor between them would give their property to their children [Karen and Sharon]. . . . [¶] Charlotte often expressed concern about her husband David's attitude and treatment toward her daughter Karen. She also, however, exhibited complete trust in David and expressed during the last year of her life her faith that he would honor their agreement regarding the disposition of their estate equally between their daughters."

Hill likewise asserted that approximately a year before her death, Charlotte "explained to me in significant detail how she and David . . . had agreed to execute identical Wills whereby they would leave all of their property to each other with the survivor dividing the remaining estate between . . . [Sharon] and [Karen]. . . . [¶] It was very apparent . . . [Charlotte] was relying upon the arrangement she had worked out with her husband, David, in ultimately disposing of her assets."

failed to satisfy subdivision (a)(1). She argues instead she satisfied section 150, subdivision (a)(3) by proffering two documents written by Charlotte which allegedly "evidence" the contract between the parties: a 1980 letter addressed to Charlotte's children and a 1985 note written to Karen.

In the 1980 letter, Charlotte lists each item of her personal property and then designates which child should receive each item after Charlotte's and David's death. The letter begins:

"What follows may seem a silly exercise. . . . [B]ut at the time I write this I do not see an harmonious family . . . . My greatest wish is that you each choose how you wish to live and that your choice makes you happy. . . . [¶] *If I die before David, everything we own is his until his death. After his death, I have designated certain items for certain children and others.* My decisions have been governed by my perception of your tastes and needs and to a great degree by my personal emotions and sentiments. [¶] *I would hope David will respect and agree to what is listed below.* If I have hurt anyone, it is not intentional." (Italics added.)

Contending this letter reflects Charlotte and David's oral agreement, Karen focuses on Charlotte's statement that when she dies David would have use of her personal property "*until* his death." (Italics added.) This statement, however, says nothing about the primary asset in the estate, which is the La Mesa house. More importantly, Charlotte refers solely to her own understanding and does not in any way mention a *mutual agreement* between the parties. The terms of the letter itself negate a finding there was such an agreement. The letter clearly states Charlotte "hopes" David would abide by her wishes. Such "hopes" are inconsistent with a conclusion that the parties had reached an irrevocable agreement to dispose of their property in a certain way.

The second document upon which Karen relies is a handwritten note written by Charlotte to Karen after September 25, 1985. In their 1985 wills, Charlotte and David had each provided that if Karen "shall have predeceased me leaving issue . . . then the . . . property distributable to [Karen's minor child] . . . shall go and be distributed to . . . Sharon . . . in trust, to hold, manage and distribute . . . ." David thereafter executed a codicil in an attempt to preclude Karen's former husband Tom from litigating against Sharon as trustee of the granddaughter's trust if Karen predeceased David and Charlotte. Some time after the codicil was executed Charlotte wrote a note to Karen, enclosing the codicil. The note states in pertinent part:

"I'm enclosing [a] copy of [David's September 25, 1985 codicil]. David wanted to make sure that [Karen's former husband] Tom could not or would

not be able to take Sharon to court so we added this enclosed codicil to make it perfectly clear that our trustee was protected from him. [¶] Our attorney assured us there was absolutely no possible way Tom could get his hands *on your money (Angela's, if you predecease her)* without showing the absolute NEED for Angela—to which the trustee would have to agree. [¶] . . . *David's will and mine are identical.*" (Italics added.)

Contrary to Karen's assertions, Charlotte's characterization of the wills as "identical" cannot in and of itself establish the parties agreed not to revoke their wills. ■ It has long been the law in this state that the execution of a mutual will does not create a presumption of an agreement not to revoke the will or wills. (See § 150, subd. (b); *Notten* v. *Mensing* (1935) 3 Cal.2d 469, 477 [45 P.2d 198].) ■ Moreover, Charlotte's statement that Karen's daughter will receive benefits under the will if Karen predeceases Charlotte and David merely reflects the contents of the wills and does not evidence an *agreement* between Charlotte and David.

Since neither document proffered by Karen makes an express or implied reference to a contract between David and Charlotte, Karen fails to establish a writing within the meaning of section 150, subdivision (a)(3).

■ We reach a similar conclusion with respect to section 150, subdivision (a)(2), requiring a party to show "an express reference in a will to a contract." Karen directs us to a provision in David's will which states: "As to personal belongings . . . , my wife has left a list, a copy of which I will place with my Will, for my executor to follow in distributing these items among my wife's children, the respective spouses and my daughter Sharon []. I understand that this gift is precatory in nature but direct my executor to comply with the terms thereof." Since Charlotte's list (contained in her 1980 letter) does not reflect an *agreement* not to revoke the wills, David's reference to such list cannot satisfy the statutory requirement that the will refer to a contract between the parties.

## II.

### Equitable Estoppel

#### A.

■ Karen alternatively contends that even if she failed to satisfy section 150's writing requirement, California courts have long applied equitable principles to enforce an oral promise not to revoke a mutual will where the survivor accepts benefits under the decedent's will. (See, e.g., *Crail* v.

*Blakely* (1973) 8 Cal.3d 744, 751-752 [106 Cal.Rptr. 187, 505 P.2d 1027]; *Notten* v. *Mensing, supra,* 3 Cal.2d at pp. 473-476; *Stahmer* v. *Schley, supra,* 96 Cal.App.3d at pp. 203-204.)

■ These decisions rest on the equitable estoppel doctrine, permitting enforcement of an oral agreement to prevent fraud when one party has detrimentally relied on an oral promise or another party has been unjustly enriched. (See *Crail* v. *Blakely, supra,* 8 Cal.3d at p. 751 [" ' "The doctrine of estoppel has been applied where an unconscionable injury would result from denying enforcement after one party has been induced to make a serious change of position in reliance on the contract or where unjust enrichment would result if a party who has received the benefits of the other's performance were allowed to invoke the statute" ' " quoting *Redke* v. *Silvertrust* (1972) 6 Cal.3d 94, 101 (98 Cal.Rptr. 293, 490 P.2d 805)]; *Stahmer* v. *Schley, supra,* 96 Cal.App.3d at p. 203 [where "the newly designated beneficiaries of the surviving testator will be unjustly enriched if the oral agreement between the decedents is not enforced . . . [they] . . . become derivatively estopped to plead the statutory requirement of a written agreement to make a will"].) ■ Applying this estoppel principle, our Supreme Court has explained that ". . . when two parties execute reciprocal wills pursuant to an oral agreement, and one of the parties dies before either will is revoked, and the other party accepts the benefit of the decedent's will, and then revokes, a constructive fraud sufficient to raise the estoppel has been practiced on the first decedent and on the beneficiaries of the oral agreement." (*Notten* v. *Mensing, supra,* 3 Cal.2d at p. 474.)

■ In opposing the summary judgment, Karen presented evidence showing that David and Charlotte orally agreed not to revoke their 1985 wills.[4] In reliance on David's promise, Charlotte refrained from changing her will and died believing her husband would carry out his promise. David thereafter succeeded to Charlotte's estate, accepted its benefits, and then

---

[4]This evidence consisted primarily of David's deposition testimony from which it can be inferred that David and Charlotte agreed to bind themselves to their 1985 wills. (See *ante,* at p. 888, fn. 2.) Contrary to David's assertions, his prior statements provide sufficient evidence to overcome a summary judgment motion on the issue of whether the couple entered into an oral agreement not to revoke their wills.

We reject, however, Karen's contention that David's deposition testimony *as a matter of law* reflects an *admission* that he orally agreed not to revoke his will. While an admission may be inferred from David's testimony, it is equally reasonable for a fact finder to infer that David was merely speaking about an understanding between a husband and wife which neither interpreted as a binding agreement. At trial Karen will have the opportunity to present David's deposition testimony and argue that it constitutes an admission. David will have the equal opportunity to explain the meaning of his statements. The finder of fact will have the responsibility for judging the credibility and demeanor of the witnesses and drawing appropriate inferences from the evidence.

immediately breached the agreement by attempting to dispose of his estate contrary to its terms.

■ David does not dispute that, under the *Notten-Crail* line of cases, the foregoing facts are sufficient to overcome a summary judgment motion as to the existence of an enforceable oral contract not to revoke a will. David maintains, however, that the *Notten-Crail* line of cases is no longer valid because the cases were decided under Civil Code section 1624, the former statute of frauds governing an agreement to leave property by a will. That statute provided in part: "The following contracts are invalid, unless the same,. or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent: [¶] . . . [¶] 6. . . . an agreement to devise or bequeath any property, or to make any provision for any person by will." (See *Lombardo* v. *Santa Monica Young Men's Christian Assn.* (1985) 169 Cal.App.3d 529, 537 [215 Cal.Rptr. 224].) In 1983, as part of a substantial revision of the Probate Code, the Legislature deleted this provision and replaced it with section 150, providing that a contract to make (or not to revoke) a will made after December 31, 1984, may be established "only" by proving the existence of one of three forms of writings. (See *ante*, at p. 886, fn. 1.) David contends that section 150 "abolished the doctrine of equitable estoppel in cases such as [this]."

### B.

The fundamental goal of statutory interpretation is to " 'ascertain the intent of the lawmakers so as to effectuate the purpose of the law.' " (*Whitman* v. *Superior Court* (1991) 54 Cal.3d 1063, 1072 [2 Cal.Rptr.2d 160, 820 P.2d 262], quoting *People* v. *Pieters* (1991) 52 Cal.3d 894, 898-899 [276 Cal.Rptr. 918 [802 P.2d 420].) In so doing, a court must look first to the plain words of the statute. (*Burden* v. *Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].) However, statutory language should not be given a literal meaning if doing so would result in consequences which the Legislature did not intend. (*People* v. *Broussard* (1993) 5 Cal.4th 1067, 1071 [22 Cal.Rptr. 278, 856 P.2d 1134].) Further, statutes must be construed in light of their historical background and evident objectives. (*Carlton Santee Corp.* v. *Parde Dam Mun. Water Dist.* (1981) 120 Cal.App.3d 14, 25 [174 Cal.Rptr. 413].)

The Legislature adopted section 150, subdivision (a) without change based on a recommendation from the California Law Revision Commission (Commission). In proposing the statutory language, the Commission expressly recognized that under Civil Code section 1624, former subdivision 6, the courts frequently enforced "oral promise[s] to make or not to revoke a will

in order to avoid the harshness that would be caused by a strict application of the Statute of Frauds." (16 Cal. Law Revision Com. Rep. (Dec. 1982) p. 2348.) The Commission, however, criticized this practice explaining "[w]here an oral agreement to make or not to revoke a will is alleged after promisor is deceased and unable to testify, there is an opportunity for the fabrication of testimony concerning the existence of the agreement. Sound policy requires some form of written evidence that such an agreement actually exists." (*Id.* at pp. 2348-2349.) The Commission qualified this statement by noting "[t]o some extent, this danger is ameliorated by the rule in California that there must be clear and convincing evidence to prove an oral agreement to make or not to revoke a will. See *Notten* v. *Mensing* [1935] 3 Cal.2d 469, 477 [45 P.2d 198]." (*Id.* at p. 2349, fn. 152.) The Commission concluded "[t]he proposed law . . . will provide a clearer, more detailed statutory statement than the present Statute of Frauds and will limit the opportunity for fraud by fabricated proof of an oral agreement."[5] (16 Cal. Law Revision Com. Rep., *supra*, at p. 2350.)

## C.

Examining section 150's statutory language and legislative history, we do not believe the Legislature intended to eliminate a court's authority to apply equitable principles in the area of contracts to make (or not to revoke) a will. It is a firmly rooted legal principle in this state that " ' ". . . the statute of frauds, having been enacted for the purpose of preventing fraud, shall not be made the instrument of shielding, protecting or aiding the party who relies upon it in the perpetration of a fraud . . . ." ' " (*Tenzer* v. *Superscope, Inc.* (1985) 39 Cal.3d 18, 30 [216 Cal.Rptr. 130, 702 P.2d 212], quoting *Seymour* v. *Oelrichs* (1909) 156 Cal. 782, 794 [106 P. 88], quoting 2 Pomeroy's Equity Jurisprudence, § 921; *Notten* v. *Mensing, supra*, 3 Cal.2d at p. 474.) This principle is part of a broader equitable doctrine providing that " ' "he who . . . leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position . . . involves fraud and falsehood, and the law abhors both." ' " (*Moore* v. *Day* (1954) 123 Cal.App.2d 134, 139-140 [266 P.2d 51], quoting *Seymour* v. *Oelrichs, supra*,

---

[5]In later comments, the Commission noted that section 150 was derived from and substantially identical to Uniform Probate Code section 2-701 (8 West's U.Laws Ann. (1983) U. Prob. Code, Contractual Arrangements Relating to Death, § 2-701, pp. 155-159). As did the Commission, the drafters of the Uniform Probate Code section 2-701 recognized the development of equitable doctrines for enforcing oral agreements and stated that "[i]t is the purpose of this section to tighten the methods by which contracts concerning succession may be proved." (*Id.*, com. at p. 155.)

In addition to directing us to the Commission's comments, both parties discuss at length a document written by a Commission staff member entitled "Memorandum." Since the Memorandum was a working paper and there was no evidence it was considered or even seen by the Legislature, it is entitled to little or no weight in discerning legislative intent.

156 Cal. at pp. 794-795, quoting *Carpy* v. *Dowdell* (1897) 115 Cal. 677 [47 P. 695], quoting *Dickerson* v. *Colgrove* (1880) 100 U.S. (10 Otto) 578 [25 L.Ed. 618].)

 To permit a promisor to assert the statute of frauds in the circumstances alleged here would violate these principles. It would allow a promisor to say that although he admitted in his deposition that he agreed orally to be bound by the terms of his will[6] and received substantial benefit because the promisee followed through with her promises, the courts are powerless to enforce such agreement because it was never in writing. We find nothing in the legislative history or language of section 150 showing that the Legislature intended to abrogate long-standing rules that courts have the power to apply equitable principles to prevent a party from using the statute of frauds where such use would constitute fraud.

In enacting section 150, the Legislature sought to identify with greater specificity the circumstances under which a writing would satisfy the statute of frauds with respect to a contract to make a will. The Legislature also sought to prevent parties from seeking assets to which they were not entitled merely by fabricating promises *by deceased persons.* Applying the equitable estoppel doctrine in this case would not undermine these concerns. Where, as here, the promisor is alive and has admitted the oral agreement, the possibility of false claims is substantially minimized. Significantly, David is available to testify at trial and can defend against false claims.

 In reaching our conclusion, we are unpersuaded by David's focus on section 150, subdivision (a)'s statement a contract to make a will may be established "only" by proving the existence of one of three forms of writings. (See *ante,* at p. 886, fn. 1.) David contends the word "only" demonstrates the Legislature intended section 150 to be the exclusive way a party could establish a contract not to revoke a will. David further points out that section 150 is materially different from Civil Code section 1624, former subdivision 6. " ' "[A] material change in the phraseology of a legislative enactment is ordinarily viewed as showing an intention on the part of the Legislature to change the meaning of the statute." ' " (See *Balboa Ins. Co.* v. *Aguirre* (1983) 149 Cal.App.3d 1002, 1007 [197 Cal.Rptr. 250], quoting *McDonough Power Equipment Co.* v. *Superior Court* (1972) 8 Cal.3d 527, 533-534, fn. 5 [105 Cal.Rptr. 330, 503 P.2d 1338].)

The primary flaw in David's argument is that, similar to section 150, Civil Code section 1624, former subdivision 6 rendered oral contracts not to

---

[6]In so characterizing the record, we emphasize we are viewing the evidence in the light most favorable to Karen, the party opposing the summary judgment motion, and do not intend to suggest we believe David did in fact enter into the oral agreement. The issue of the existence of an agreement is a matter for the trier of fact.

revoke a will unenforceable *"unless"* they were in writing. The courts nonetheless frequently enforced such oral contracts when to permit a party to deny the existence of the contract would constitute fraud. (See *Crail* v. *Blakely, supra,* 8 Cal.3d at p. 751 [" ' "Although the statute *requires* that an agreement to make a provision by will be in writing [citation], a party [is] estopped from relying on the statute where fraud would result from refusal to enforce an oral contract [citation]." ' " Quoting *Redke* v. *Silvertrust, supra,* 6 Cal.3d at p. 101, italics added].) ▐▐ The words "only" and "unless" have substantially similar meanings; they are distinguishable primarily because of their placement within a sentence.

▐▐ Equally important, David ignores the well-settled principle that courts should not presume the Legislature intended "to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication." (*People* v. *Davenport* (1985) 41 Cal.3d 247, 266 [221 Cal.Rptr. 794, 710 P.2d 861]; *Barragan* v. *Workers' Comp. Appeals Bd.* (1987) 195 Cal.App.3d 637, 650 [240 Cal.Rptr. 811].) The Legislature could have easily stated it intended to abrogate long-established equitable principles. It did not do so.

We further reject David's reliance on two out-of-state decisions. (See *Orlando* v. *Prewett* (1985) 218 Mont. 5 [705 P.2d 593]; *Matter of Estate of Cosman* (1984) 193 N.J.Super. 664 [475 A.2d 659].)

In *Orlando,* a niece alleged her uncle agreed that if she moved to his ranch and operated it, he would leave the niece an undivided one-half interest in the ranch. (*Orlando* v. *Prewett, supra,* 705 P.2d at pp. 594-595.) Relying on the agreement, the niece performed her part of the bargain. The uncle died two years later without naming the niece as a beneficiary in his will. (*Id.* at p. 595.) Interpreting a Montana statute essentially identical to section 150, subdivision (a), the Montana Supreme Court held the oral agreement was not enforceable, reasoning the court had no authority to graft a part performance exception into the statutory language. (705 P.2d at pp. 596-598.)

In *Matter of Estate of Cosman,* John Herbison and Carmen Cosman executed mutual wills each leaving their estate to their survivor and then equally to their children by former marriages. (*Matter of Estate of Cosman, supra,* 475 A.2d at p. 660.) After Herbison died, Cosman changed her will, leaving the estate only to her own children. Cosman died and Herbison's sons brought an action against Cosman's estate, alleging she breached her agreement not to revoke her will. (*Id.* at p. 661.) The court held the agreement was not enforceable because the applicable New Jersey statute (substantially identical to § 150, subd. (a)) "leaves no room for judicial

construction. . . . The principles of equitable fraud and promissory estoppel . . . are unavailing in the face of the unequivocal legislative declaration." (475 A.2d at p. 662.)

*Orlando* and *Matter of Estate of Cosman* are distinguishable because in those cases, the party against whom the agreement was sought to be enforced was dead. "The death of the promisor makes it impossible to contradict the testimony to the effect that he made such promise." (*Orlando* v. *Prewett, supra*, 705 P.2d at p. 598.) Unlike the uncle in *Orlando* and Cosman in *Matter of Estate of Cosman*, David is alive, testified at his deposition, and is available to testify at trial. David will have the full opportunity to explain the circumstances surrounding the execution of the mutual wills and to contradict any allegedly false claims made by Karen. Further, to the extent *Orlando* and *Matter of Estate of Cosman* contain expansive language supporting a conclusion that the New Jersey and Montana Legislatures intended to wholly eliminate judicial equitable authority in this area, we are unpersuaded that the California Legislature intended a similar result.

While section 150, subdivision (a) generally provides the sole means under which a party can establish an agreement not to revoke a will, the Legislature did not express an intent to abolish the use of the equitable estoppel doctrine in appropriate circumstances. ■ For purposes of the summary judgment motion, Karen proffered sufficient evidence to establish (a) an oral agreement between David and Charlotte not to revoke their mutual wills; and (b) circumstances supporting the application of the equitable estoppel doctrine. Since there are triable issues of fact as to whether the parties entered into an oral agreement and whether that agreement is enforceable under the equitable estoppel doctrine, the court erred in granting summary judgment.[7]

## DISPOSITION

Judgment reversed. Appellant to recover costs on appeal.

Todd, Acting P. J., and Benke, J., concurred.

---

[7]Our ruling on this appeal should not be construed as an expression of our view on the ultimate merits of the action.