[No. A070909. First Dist., Div. Four. Feb. 18, 1997.]

GLADYS A. BYRNE, Plaintiff and Appellant, v.
CHARON A. LAURA et al., Defendants and Respondents.

## Counsel

Stefanie Y. Gandolfi, Kristin Hansen and Nicholas J. Barbarotto for Plaintiff and Appellant.

Bronson, Bronson & McKinnon, Michele K. Trausch and Kymberly E. Speer for Defendants and Respondents.

## Opinion

HANLON, J.—Appellant Gladys A. Byrne (Flo) sued respondents Charon A. Laura, et al., the administrator and heirs of the estate of Donald F. Lavezzo (respondents are hereafter referred to collectively as the Estate) to enforce her *Marvin* agreement (*Marvin* v. *Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106]) with the decedent (hereafter referred to as Skip).[1] The Estate cross-complained against Flo for damages for removing personal property from the home she had shared with Skip before his death, and for unpaid rent based on her occupancy of the home after his death.

---

[1] We refer to the parties by their first names because that is how they are designated in the briefs.

The Estate's motion for summary adjudication was granted as to all of Flo's causes of action other than her quantum meruit claim, the Estate dismissed its claim for conversion without prejudice, and the case proceeded to trial before the court on Flo's quantum meruit claim and the Estate's claim for unpaid rent. The trial court found that there had been no agreement between Skip and Flo to compensate Flo for her services, and that, even if there had been such an agreement, Flo had been adequately compensated for any services she provided. Judgment was entered against Flo for $2,400 for unpaid rent, and in favor of the Estate on all of Flo's causes of action.

On appeal from the judgment, Flo contends that the court erred in granting the summary adjudication motion, and that she was entitled to a trial on her causes of action other than the one for quantum meruit. We reverse the judgment on the claims that were summarily adjudicated and on the Estate's claim for unpaid rent.

## I.  FACTS

Evidence presented on the motion for summary adjudication included declarations and deposition testimony from Flo, Flo's daughter Denise, Flo's niece, a neighbor of Skip's who had known Skip and Flo since the 1930's and '40's, and two couples, the Maffeis and Simpsons, who had known Flo and Skip since their days together in high school.

Skip and Flo were childhood sweethearts who were engaged to be married when Flo was 18, but Flo broke off the engagement and they married other people. Skip was divorced from his wife in 1974, and Flo's husband died in January of 1987. Skip and Flo began dating in August of 1987, and he proposed marriage to her that December. She declined his proposal because her handicapped children, Lori and Michele, would lose insurance coverage from her deceased husband's employer if she remarried.

Skip and Flo began living together in January of 1988. She moved from San Mateo into his house in San Francisco, and they resided there together until Skip's death in 1993. When Flo was asked why she moved in with Skip, she said, "[b]ecause I loved him and we wanted to be together." The Maffeis and Simpsons said that Skip adored Flo, and called her "the queen."

When Flo moved into Skip's home in San Francisco, she brought furniture and linens from her rented house in San Mateo and commingled her belongings with Skip's. The couple eliminated some of the items Skip had in the home, purchased new furniture together, and opened a joint savings account. Flo cleaned up the house, and saw to the installation of new drapes, carpets, and appliances.

Flo said that, when she moved in, Skip told her that it "was our home, and that anything that he had was mine, and I told him . . . whatever I had was his." Skip also told their friends that his possessions in the house belonged to Flo. The Simpsons recalled going over to the house for dinner, Mrs. Simpson "commenting on different pretty hand-painted Italian dishes that maybe were [Skip's] mom's," and Skip saying "well, they belong to the queen, and everything in this house is hers." Skip also said that his car was Flo's, and he apparently put their names on the license plate. When Mr. Simpson "commented about the license plate on the car," Skip said, "well, its our car, you know. It's Flo and Skip."

Skip promised Flo when she moved in, and many times thereafter, that he would take care of her for the rest of her life in exchange for her services as a homemaker. Skip repeatedly reassured Flo that she did not have to worry because he would take care of her and she would "have a roof over [her] head." Skip also assured Flo's niece and her daughter Denise, and told the Maffeis and Simpsons, that he intended to take care of Flo.

During the first four years they lived together, Skip continued working as a plumber in San Francisco, and Flo continued working part time at a school cafeteria in San Mateo. Flo did all of the couple's cooking, cleaning, laundry, and shopping. She handled their entertaining, and took care of Skip if he got sick. Their neighbor, Blanche Maffei, recalled that when she jokingly asked Skip, " 'How's married life?' he answered, 'Wonderful! Flo takes very good care of me.' " They "cohabited," in Flo's words, "as husband and wife."

Flo contributed all of her earnings toward the household, and Skip paid for Flo's living expenses, including paying her monthly credit card balances and giving her grocery and spending money on a regular basis. Skip paid to set up a conservatorship for Flo's handicapped daughters, and made Flo the beneficiary of his retirement benefits. Flo was not relying solely on Skip's pension benefits to provide for her future. She said that Skip was a very private person, and that she did not "think it was my place to ask him how much money he had." But she trusted Skip, and believed him when he indicated that he had sufficient funds in the form of savings, stocks, and bonds to afford them both a comfortable retirement.

Skip retired in March of 1992. Flo continued working, but then began suffering from angina, and underwent double bypass surgery in September of 1992. Flo returned to work after a period of disability, and then retired in May of 1993. In the months when Flo did not work, Skip wrote her a check for $500, in addition to giving her money for anything she needed. Flo said

she retired because "Skip wanted [her] to stay home and to retire and spend more time with him." "[H]e relied on [her] staying home so that [they] could have a good life together . . . ."

Skip renewed his marriage proposals to Flo on many occasions while they lived together, but she continued to decline them out of concern over the insurance for her handicapped daughters. On June 15, 1993, Skip and Flo were out to dinner with the Maffeis and Simpsons, and while Flo was away from the table, Skip said that he wanted them all to take a cruise to Hawaii, where he was going to surprise Flo and arrange a marriage ceremony. Skip gave the Simpsons a wedding ring for Flo, and asked them to keep it for him. They planned to spend the July 4th holiday at the Simpsons' place in the country finalizing the dates and details of the cruise and wedding.

However, Skip died unexpectedly on June 29, 1993.

Flo said that she and Skip promised each other and agreed that all of the property they owned when they began living together and later acquired "would be jointly held and mutually owned by us and remain the property of the survivor of us." Skip repeatedly told Flo that everything he had was hers, and Flo's daughter and niece and the Maffeis and Simpsons all recalled statements by Skip to the effect that everything he had was Flo's and would someday belong to her. Skip repeatedly assured Flo that he was going to put everything, including the house, stocks and bonds, in her name. Just a week before he died, he reiterated to her that he was going to put all of his property into a living trust for her benefit.

However, according to Flo, Skip "was a procrastinator, and he'd always say 'Well, I'm going to change everything into your name, the house,' et cetera, through all the years that we lived together. But he was the type of person that didn't move too quickly on things. He procrastinated all his life. [¶] So finally, like I said, the week before he died, we sat down and talked and got to the issue that we were going to do the living trust or a will because he said as of then, he didn't have anything legal. So this was something that he had to do."

Skip left an estate worth over $1.2 million. The property consisted of: $844,023.99 in stocks and bonds; $134,689.66 in various bank accounts; the house, appraised at $246,000; furnishings in the house valued at $3,000; and a 1988 Camaro valued at $5,500. Skip also left a will dated December 10, 1975, leaving all of his property to his parents or, if they did not survive him, to Claire Suy.

All of the named beneficiaries under the will had predeceased Skip. The Simpsons said that Skip never talked about family other than his parents, and

as far as they knew he had no other relatives. Yolanda Maffei said that Skip "had nobody else in his life but Flo." She said that before he got together with Flo, "Skip was very much alone and very much lonesome. We one time had him for Christmas when nobody else did."

Flo said she was in a state of shock after Skip died. She considered everything of Skip's to be hers, but she did not have an attorney at the time, and did not know what her legal rights might be. She purchased the Camaro Skip had driven, and moved out of the home after she was asked to leave, taking some property in the home with her.

Flo filed a creditor's claim against Skip's estate alleging that she was the "sole and exclusive owner" of all of his property. After the claim was rejected, she filed a complaint against the Estate, which, in addition to the cause of action for quantum meruit, included causes of action for: "damages for failure to pay debt on rejected claim"; "specific performance of express oral agreement"; "imposition of constructive trust"; "temporary restraining order, preliminary injunction and permanent injunction"; "breach of oral contract"; and "declaratory relief."

The Estate moved for summary adjudication of these claims on the ground that Skip's promises were too uncertain to enforce, or, alternatively, that enforcement of the promises was barred by statutes of frauds, and there was insufficient evidence to support an estoppel to rely on a statute of frauds defense. In response, Flo argued that the evidence was sufficient to support her claims for breach of contract, and that the evidence established an inter vivos gift to her of all of Skip's property. In reply, the Estate argued inter alia that Flo's testimony and her actions in the wake of Skip's death negated any claim of a valid inter vivos transfer of any of Skip's assets.

The court determined that all of Skip's promises boiled down to an agreement to create a joint tenancy. When the court indicated that it was inclined to grant the motion for summary adjudication on the basis of this finding, and acknowledged that the Estate had not advanced an argument about joint tenancy until its reply brief on the motion, Flo requested an opportunity to submit further evidence and authorities on the point. The request was denied and the court proceeded to file its order on the motion.

The text of the order granting the motion for summary adjudication, with bracketed inserts added, reads in full as follows: "Defendant's motion for summary adjudication of causes of action is GRANTED as to all causes of action except the sixth [quantum meruit] cause of action. (Civ. Code, § 683 [agreements for joint tenancy must be in writing]; *Estate of Seibert* (1990)

226 Cal.App.3d 338, 342-343, 344 [276 Cal.Rptr. 508] [equitable estoppel cannot be used to enforce oral joint tenancy].)"

## II. Discussion

### A. *Introduction*

The summary adjudication of Flo's claims cannot be sustained on the narrow grounds cited by the law and motion court. The ruling against Flo rested entirely on the finding of fact that she and Skip had an oral joint tenancy agreement, and the conclusion of law that equity does not allow for the enforcement of such an agreement. However, all of the promises and conduct in evidence cannot be characterized solely as an agreement for a joint tenancy, and to the extent that the agreements at issue are subject to a statute of frauds, there is a triable issue of fact as to whether the Estate is equitably estopped to assert the statute as a defense. The summary adjudication of Flo's claims must therefore be reversed.

### B. *Failure to Honor Flo's Creditor's Claim (Support Agreement)*

In support of her creditor's claim in the probate proceeding, Flo declared that "at all times" she had "relied upon Skip's promises and his assurances that he would take care of me for the rest of my life." She submitted declarations from the Maffeis, and her niece and daughter, who likewise reported that Skip had said that he would take care of Flo for the rest of her life. Similar testimony was given in depositions after the rejection of the creditor's claim, and presented in opposition to the motion for summary adjudication. Skip's repeated promises to care for Flo for the rest of her life created a triable issue of fact as to the existence of a contract for her support.

Support agreements between cohabitants are enforceable under the *Marvin* case. (*Marvin* v. *Marvin*, *supra*, 18 Cal.3d at pp. 665, 674-675, 685, fn. 26; *Friedman* v. *Friedman* (1993) 20 Cal.App.4th 876, 889 [24 Cal.Rptr.2d 892]; *Marvin* v. *Marvin* (1981) 122 Cal.App.3d 871, 876 [176 Cal.Rptr. 555].) Skip's promise of support is indistinguishable from that of the defendant in *Marvin*, who allegedly "agreed to 'provide for all of plaintiff's financial support and needs for the rest of her life.'" (*Marvin* v. *Marvin*, *supra*, 18 Cal.3d at p. 666.) *Marvin* held that this agreement supported a cause of action for breach of an express contract (*id.* at pp. 667, 675), and there is no basis for a different conclusion in Flo's case. No issue is raised of any breach of contract on Flo's part. The record indicates that she fully performed the role of a loving spouse during all of the time they lived together.

A *Marvin* agreement is enforceable against an estate when one of the parties to the agreement dies. (See *Estate of Fincher* (1981) 119 Cal.App.3d 343, 348-350 [174 Cal.Rptr. 18]; Hogoboom & King, Cal. Practice Guide: Family Law 3 (The Rutter Group 1996) ¶20:55, p. 20-11, rev. #1, 1995.) There is no evidence that Skip breached his promise of support during his lifetime. To the contrary, it appears that Skip gave Flo money to buy anything she needed and sought to provide her with a comfortable life while they lived together. Thus, Skip's caring for Flo during his lifetime is further evidence of the existence of a contract for support. However, the *estate* breached that contract by rejecting Flo's claim and thereby failing to provide her with means of support after Skip died. Accordingly, we conclude that it was error to grant the motion for summary adjudication of Flo's cause of action for "Damages for Failure to Pay Debt on Rejected Claim."

The Estate's various arguments with respect to Flo's case generally and her claim of support in particular do not alter this conclusion. The Estate's threshold contention is that, because Flo does not contest the outcome of the trial of her quantum meruit claim, she has waived any challenge to the grant of summary adjudication of her contract causes of action. This argument is premised on the assertion, advanced without authority, that Skip's various promises were not "severable." The Estate reasons that, because there was only one contract between Skip and Flo, and the finding after trial was that "the" contract did not exist, that finding precludes any recovery for breach of contract.

However, the claim that Skip agreed out of love and concern to care for Flo for the rest of her life is manifestly different from a claim that he had agreed to compensate her for the value of her services as if she had been his maid. As the Estate itself emphasized at the end of its closing argument at trial, "[t]he concept of quantum meruit is *not* some future I'll always be taken care [of]; it is payment for services rendered." A trier of fact could conclude that Skip had agreed to support Flo apart from any understanding about payment for her household services.

Skip's promises to care for Flo were likewise distinct from his statements about giving her his property, and those promises could be construed by a trier of fact as an agreement for support apart from any entitlement Flo might have to specific assets. Support and property division are separate issues in marital dissolutions (Fam. Code, §§ 2500 et seq., 4300 et seq.), and they are also separate issues for cohabitants. (See *Marvin* v. *Marvin, supra,* 18 Cal.3d at pp. 674-675 [distinguishing between agreement for support and agreement for sharing of property].) In granting summary adjudication, the court focused entirely on the evidence of Skip and Flo's property arrangement, and improperly ignored the evidence of a contract for Flo's support.

The Estate contends that the support claim must be rejected because it has been "newly-minted" to circumvent the summary adjudication ruling. However, while it is generally improper to assert a new theory for the first time on appeal, it is the Estate, not Flo, that has changed its position by arguing, contrary to its theory at trial, that all of Flo's contract claims were subsumed in her quantum meruit cause of action. Flo has asserted from the time she filed her creditor's claim that there was an agreement for her support, and although she has not specifically related the support agreement to the cause of action for rejection of her creditor's claim as we have done here, she has consistently and correctly maintained that the motion for summary adjudication could not be granted in light of that agreement. There are no grounds for concluding that Flo has waived her claim for support.

The Estate argues that the oral promise of support is not enforceable under Probate Code section 150, subdivision (a), which provides that a "contract to make a will or devise" must be in writing. However, this statute is inapplicable. An agreement for support, even for a lifetime, is by its terms neither a "contract to make a will," nor a contract to make a "devise," as that word is defined in the Probate Code to mean "a disposition of real or personal property by will." (Prob. Code, § 32.) No disposition by will was expressly agreed upon or necessarily implicit in the promise of support because Flo could have predeceased Skip, and in that event the contract could have been fully performed during Skip's lifetime. The fact that Skip died, and thus that the amounts owed were payable from his estate, did not transform the agreement into a promise to make a will or devise. If that were the result, then every contractual claim against an estate would involve a will or devise.[2]

■ The Estate contends that Skip's promises to Flo are too uncertain to enforce. However, "the modern trend of the law favors carrying out the parties' intention through the enforcement of contracts and disfavors holding them unenforceable because of uncertainty." (*Hennefer* v. *Butcher* (1986) 182 Cal.App.3d 492, 500 [227 Cal.Rptr. 318].)[3] *Marvin* endorsed "a policy based upon the fulfillment of the reasonable expectations of the parties to a

---

[2]The Estate also suggests that the support agreement "may" be subject to a statute of frauds other than Probate Code section 150, such as the one set forth in Civil Code section 1624, subdivision (b), covering promises to answer for the debt of another. However, there is no evidence that Flo is in debt, it is not apparent that any other statute of frauds applies, and the point is ultimately immaterial to our review of the summary adjudication in any event because, as discussed below, estoppel to assert a statute of frauds is a triable issue in Flo's case.

[3]*Hennefer* v. *Butcher* addressed an action for specific performance rather than damages, but the distinction is irrelevant to our analysis because the certainty requirement may be even

nonmarital relationship." (*Marvin* v. *Marvin, supra,* 18 Cal.3d at p. 684.) If Flo's evidence is credited, as it must be for purposes of summary adjudication (*Waisbren* v. *Peppercorn Productions, Inc.* (1995) 41 Cal.App.4th 246, 252 [48 Cal.Rptr.2d 437]), then it is certain that Skip expected to provide for Flo's support. Denial of that expectation as a matter of law would be contrary to the policy enunciated in *Marvin.* Moreover, as Flo observes, her understandings with Skip were no more uncertain than the "general and nonspecific" *Marvin* agreement which was enforced in *Alderson* v. *Alderson* (1986) 180 Cal.App.3d 450, 463 [225 Cal.Rptr. 610], where "[t]he parties never bothered to actually spell out the terms of their agreement or the consideration therefor."

It is unclear how *much* support Skip intended by his promises to take care of Flo, but uncertainty about " 'the precise act . . . to be done' " may be resolved in light of extrinsic evidence. (*Crescenta Valley Moose Lodge* v. *Bunt* (1970) 8 Cal.App.3d 682, 689 [87 Cal.Rptr. 428].) Flo received about $96,500 from Skip's retirement benefits, and she has testified that Skip told her " 'I'm putting you down as beneficiary on my retirement because I want to take care of you.' " Based on this evidence, the Estate can argue that Flo has already been "taken care of" in the manner Skip intended. On the other hand, Skip provided Flo with a certain standard of living before he died, which included a rent-free residence and money to cover all of her other needs. Flo could argue on the basis of that conduct for a level of support consistent with the lifestyle she and Skip had enjoyed. Flo could also argue for all or half of Skip's assets by way of support, based on his statements to her "that he was able to retire early because he was very careful in what he did [with his money], and that I didn't have to worry about retiring because *what he had* would take care of us for the rest of both of our lives, that we would not be limited, that we would be able to not go overboard, but do things that we would enjoy doing together."

These conflicting interpretations and any others supported by reasonable inferences from the evidence must be resolved by a trier of fact. "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties" (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545]), and "questions of 'intent' and 'purpose' are ordinarily questions of fact" (*Redke* v. *Silvertrust* (1971) 6 Cal.3d 94, 103 [98 Cal.Rptr. 293, 490 P.2d 805]). Where, as here, the agreement is reasonably susceptible of different interpretations, summary adjudication is an inappropriate means of resolving the ambiguity. (See

---

stricter in the context of a suit for specific performance. (See *Hennefer* v. *Butcher, supra,* 182 Cal.App.3d at p. 500, fn. 4.)

*Walsh* v. *Walsh* (1941) 18 Cal.2d 439, 444 [116 P.2d 62]; *Faus* v. *Pacific Elec. Ry. Co.* (1960) 187 Cal.App.2d 563, 570 [9 Cal.Rptr. 697]; see also *Castaneda* v. *Dura-Vent Corp.* (9th Cir. 1981) 648 F.2d 612, 619.)[4] The judgment on the cause of action based on the rejection of Flo's creditor's claim must therefore be reversed.

### C. Damages for Skip's Breach of Contract (Property Agreement)

■ Property agreements between cohabitants are enforceable under *Marvin*. (*Marvin* v. *Marvin*, *supra*, 18 Cal.3d at pp. 674-675.) Skip told Flo and others that all of his assets would "someday" be hers, and he repeatedly promised Flo that he would "change everything into [her] name" to insure that she obtained all of his property. However, Skip was a "procrastinator," and he admitted to Flo a week before he died that "he didn't have anything legal." Skip acknowledged that execution of documents providing for transfer of his property to Flo was "something that he had to do," but then died before making the necessary arrangements. The foregoing is substantial evidence of an agreement between Skip and Flo that he would arrange for her to receive all of his property, and a breach of that agreement by Skip. The question is whether there is any triable issue on Flo's claim for damages, in an amount equal to the value of Skip's estate, for this breach.

There is no merit to the Estate's argument that the property agreement between Skip and Flo was too uncertain to enforce. We have already concluded that the support agreement was not void for uncertainty, even though the amount of support to be paid was arguable under the circumstances. The property agreement was more definite than the support agreement because there is no doubt as to the amount involved. According to Flo's evidence, Skip promised her in no uncertain terms that she would succeed to *all* of his property. The only uncertainty was *how* Skip intended to effectuate his promise.

There were various means by which Skip could have provided for the transfer of all of his property to Flo in the event of his death, including placement of his property in joint tenancy with Flo, execution of a will, or

---

[4]The *Crescenta Valley, Redke, Walsh* and *Faus* cases involved written contracts, but the basic principles they identify with respect to the resolution of ambiguities apply equally to oral agreements. (See, e.g., *Nelson* v. *Abraham* (1947) 29 Cal.2d 745, 750 [177 P.2d 931] [terms of oral agreement were defined by "the conduct of the parties thereunder, considering the nature of the undertaking and the surrounding circumstances"]; *Neff* v. *Mutual Life Ins. Co.* (1941) 48 Cal.App.2d 110, 112-113 [119 P.2d 404] [trial court may receive evidence to show the "true meaning" of ambiguous oral contract].)

entry into a revocable "living" trust. (See generally, Bredenbeck et al., Estate Planning for the Unmarried (Cont.Ed.Bar 1993) pp. 31-46 ["Vehicles for Implementing and Documenting Estate Plan"].) Flo's understanding with Skip—that all of their property "would be jointly held and mutually owned by us and remain the property of the survivor of us"—is consistent with a joint tenancy. However, Skip and Flo also discussed "do[ing] the living trust or a will" shortly before he died. Thus, it is unclear which of the vehicles Skip intended to use.

Each of the possible arrangements was subject to a statute of frauds (Civ. Code, § 683 [joint tenancy]; Prob. Code §§ 150 [will or devise], 15206 [trust for real property]), and there was no written agreement. Skip assured Flo that he was going to put everything "in [Flo's] name," but those assurances were not in writing, and "an oral agreement *to make a contract which must be in writing, is itself within the statute of frauds." (*Paul* v. *Layne & Bowler Corp.* (1937) 9 Cal.2d 561, 564 [71 P.2d 817].) ▇ The question, then, is whether the failure to satisfy any of the potentially applicable statutes of frauds is as a matter of law a complete defense to the property agreement.

▇ Equitable estoppel may preclude the use of a statute of frauds defense. In the leading case on the subject, Justice Traynor wrote: "The doctrine of estoppel to assert the statue of frauds has been consistently applied by the courts of this state to prevent fraud that would result from refusal to enforce oral contracts in certain circumstances. Such fraud may inhere in the unconscionable injury that would result from denying enforcement of the contract after one party has been induced by the other seriously to change his position in reliance on the contract . . . ." (*Monarco* v. *Lo Greco* (1950) 35 Cal.2d 621, 623 [220 P.2d 737].)[5] The equitable principles set forth in *Monarco* have been echoed in many subsequent cases and are well settled. (See, e.g., *Redke* v. *Silvertrust, supra,* 6 Cal.3d at p. 101; *Day* v. *Greene* (1963) 59 Cal.2d 404, 410 [29 Cal.Rptr. 785, 380 P.2d 385, 94 A.L.R.2d 802]; *Allied Grape Growers* v. *Bronco Wine Co.* (1988) 203 Cal.App.3d 432, 444 [249 Cal.Rptr. 872]; *Mintz* v. *Rowitz* (1970) 13 Cal.App.3d 216, 224-225 [91 Cal.Rptr. 435]; see also *In re Diego's Inc.* (9th Cir. 1996) 88 F.3d 775, 778.) Whether the doctrine of equitable estoppel should be applied in a given case is generally a question of fact. (*Phillippe* v. *Shapell Industries* (1987) 43 Cal.3d 1247, 1272 [241 Cal.Rptr. 22, 743 P.2d 1279] (dis. opn. of Kaufman, J.); *Carlson* v. *Richardson* (1968) 267 Cal.App.2d 204, 208-209 [72 Cal.Rptr. 769].)

---

[5]*Monarco* also holds that estoppel may be used to prevent "the unjust enrichment that would result if a party who has received the benefits of the other's performance were allowed to rely upon the statute" (35 Cal.2d at pp. 623-624), but we need not address the "unjust enrichment" prong of *Monarco* in Flo's case.

Equitable estoppel to rely on a statute of frauds is certainly a question of fact in Flo's case. Flo has stated that she relied on Skip's assurances that she would receive his property and that he would document this understanding. The reliance supporting an equitable estoppel need not necessarily be reliance on representations that a writing will be executed (*Monarco* v. *Lo Greco, supra*, 35 Cal.2d at pp. 625-626), but Flo's evidence that she relied on such representations constitutes a classic case for application of the doctrine. (See *Wilk* v. *Vencill* (1947) 30 Cal.2d 104, 107 [180 P.2d 351]; 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 743, p. 200.) A trier of fact could find that Flo had "seriously" changed her position in reliance on Skip's promises by moving in with him, performing the duties of a spouse, and retiring from her job at his insistence. (See *Porporato* v. *Devincenzi* (1968) 261 Cal.App.2d 670, 673, 678-679 [68 Cal.Rptr. 210] [in reliance on decedent's oral promise to devise home to plaintiff, plaintiff remained in San Francisco and did not seek employment].) A trier of fact could also conclude that Flo would be "unconscionably" injured, under the circumstances, if the lack of a writing precluded any recovery. (*Id.* at p. 679.) Since equitable estoppel is a triable issue of fact in Flo's case, it was error to summarily adjudicate her claim for damages for breach of the property agreement.

The law and motion court could reach a contrary result only by first construing the property agreement to be for the creation of a joint tenancy, and then applying *Estate of Seibert* (1990) 226 Cal.App.3d 338 [276 Cal.Rptr. 508], which holds that joint tenancy agreements are not subject to the doctrine of equitable estoppel. The *Seibert* court found no case which had applied the doctrine to a joint tenancy, and concluded on that basis alone that the writing requirement for joint tenancies constituted "a more formidable 'statute of frauds' than the ordinary requirement pertaining to contracts having to do with real property." (*Id.* at p. 343.)

*Seibert's* reasoning is unpersuasive for a number of reasons. First, we fail to see why an agreement for a joint tenancy in real property should be treated differently for equitable purposes than any other conveyance of land, and the court does not explain the distinction. Second, it is not true that there is no precedent for equitable enforcement of an unwritten joint tenancy. While we have not undertaken an exhaustive survey of the subject, we have found at least one case in which an implied contract for a joint tenancy in real property was enforced on the basis of an equitable estoppel. (See *Grant* v. *Long* (1939) 33 Cal.App.2d 725, 739-742 [92 P.2d 940].) Third, even if there were no precedent for application of equitable estoppel in connection with a joint tenancy, that alone would not be a sufficient reason to conclude

that the doctrine could not be so applied. Equitable estoppel is a "firmly rooted legal principle in this state" (*Juran v. Epstein* (1994) 23 Cal.App.4th 882, 894 [28 Cal.Rptr.2d 588]), which generally applies to *all* statutes of frauds. (*Phillippe v. Shapell Industries, supra,* 43 Cal.3d at pp. 1272-1273 (dis. opn. of Kaufman, J.); *Hall v. Hall* (1990) 222 Cal.App.3d 578, 585 [271 Cal.Rptr. 773].) Exceptions to this general rule may be drawn on the basis of a substantial public policy (*Phillippe v. Shapell Industries, supra,* at pp. 1265-1269 [consumer protection statute]) or a clear directive from the Legislature (see *Juran v. Epstein, supra,* at p. 896). However, neither of these grounds for an exception is identified in *Seibert,* and it is not apparent that either applies to joint tenancies.

The absence of an enforceable joint tenancy would not be fatal to Flo's claim for damages for breach of the property agreement in any event. As we have noted, joint tenancy is only one of several means by which Skip could have effected his promise to give Flo his property. It is not clear that Skip had resolved to employ a joint tenancy. Skip and Flo did not use the words "joint tenancy" to describe their property agreement, Skip did not have any particular form of agreement drawn up, and it appears from his statements shortly before his death that he may have been more inclined to use a trust than a joint tenancy. The evidence was at least susceptible of different interpretations, and did not support the court's finding as a matter of law that the agreement was for a joint tenancy. Indeed, a different finding was compelled under the court's reasoning.

"A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643.) Thus, "[i]t is a fundamental rule of contractual construction that where two interpretations are reasonably permissible, courts will adopt that which renders a contract valid and effectual." (*Service Employees Internat. Union, Local 18 v. American Building Maintenance Co.* (1972) 29 Cal.App.3d 356, 359 [105 Cal.Rptr. 564].) ■ While there may be little precedent for the use of equitable estoppel to enforce an oral joint tenancy, it is settled that the doctrine may be employed to enforce an oral trust in land where the beneficiary has "irrevocably change[d] his position in reliance upon the trust." (Rest.2d Trusts, § 50; see *Jose v. Pacific Tile & Porcelain Co.* (1967) 251 Cal.App.2d 141, 144-145 [58 Cal.Rptr. 880]; *Mulli v. Mulli* (1951) 105 Cal.App.2d 68, 73 [232 P.2d 556]; *Haskell v. First Nat. Bank* (1939) 33 Cal.App.2d 399, 402 [91 P.2d 934].) Thus, there is no question that if Skip intended to put his property in trust, Flo would have a triable claim to an estoppel against a statute of frauds defense.

Insofar as it appears from the evidence, Skip could just as well have intended to use a trust as a joint tenancy. Both interpretations are "reasonably permissible." If an oral joint tenancy were in fact absolutely unenforceable, then the rule of construction in favor of enforcement would dictate that the contract be interpreted to be for the creation of a trust, rather than a joint tenancy.[6] Such an interpretation would not "violate" Skip's intentions. According to Flo's evidence, he would have wanted her to have a chance to enforce their property agreement.

The evidence, in sum, cannot properly be construed so as to negate a claim to damages for breach of the property agreement on a theory of equitable estoppel. There are two triable issues of fact: (1) whether there was such an agreement; and (2) whether Flo should be allowed to enforce it through equitable estoppel. The form of the arrangement Skip may have intended—joint tenancy, will, or trust—is irrelevant.

The Estate contends finally that Flo cannot establish an estoppel because she fulfilled her part of the bargain with Skip out of love for him and not just out of a desire for his property. This argument is premised on a statement in the *Seibert* case that, in order to enforce "a joint tenancy commitment through estoppel . . . [the plaintiff] would be required to demonstrate not only that she relied upon the alleged promise from the decedent, but that she entered into acts or performance which was 'not only referable, but unequivocably [*sic*] referable, to the particular oral agreement sought to be enforced.'" (*Estate of Seibert, supra,* 226 Cal.App.3d at p. 343.) *Seibert* reasoned that estoppel could not be invoked in that case because the actions taken by the plaintiff in alleged reliance on her oral joint tenancy agreement with the decedent could "just as easily [have been] explained by her renewed interest in him generally, resulting from their resumption of a conjugal relationship." (*Ibid.*) Since it is undisputed that Flo performed her part of the agreement with Skip because she loved him and not solely because she wanted his property, the Estate submits that *Seibert*'s reasoning precludes any finding of estoppel in Flo's case.

However, *Seibert* is insupportable insofar as it suggests that equitable estoppel must be predicated on "performance 'unequivocally referable' to the contract." This portion of *Seibert* conflates the doctrines of equitable

---

[6]The same analysis would apply to a will. We need not decide whether equity could be used in Flo's case to avoid Probate Code section 150's writing requirement for a contract to make a will, because it is not clear that a will was intended. On review of the summary adjudication, we need only determine that one of the means, a trust, by which the property agreement could have been effected is potentially enforceable under an estoppel theory.

estoppel and part performance. When a plaintiff seeks to avoid a statute of frauds on the ground of part performance, it has sometimes been said that the performance must be "unequivocally referable" to the agreement to be enforced. (See Note, *Part Performance, Estoppel, and the California Statute of Frauds* (1951) 3 Stan.L.Rev. 281, 286.) "It is doubtful that acts are ever unequivocally referable to a contract," and this requirement has not been consistently applied even in part performance cases. (*Ibid.*) ■ The doctrines of part performance and equitable estoppel are, in any event, separate grounds for avoiding a statute of frauds. (*Id.* at pp. 281-283; see, e.g., *Paul v. Layne & Bowler Corp., supra*, 9 Cal.2d at pp. 564-565 [considering, in turn, part performance and equitable estoppel].) *Seibert* itself, prior to the passage at issue, referred to "cases establishing part performance *and* detrimental reliance as grounds for enforcing an oral agreement." (*Estate of Seibert, supra*, 226 Cal.App.3d at p. 342, italics added.) The sole authority cited by *Seibert* in support of its analysis, 35 California Jurisprudence Third, Frauds, Statute of, section 85, pages 121-122, concerns part performance, not equitable estoppel (as to the latter, see 35 Cal.Jur.3d, *supra*, § 95 et seq., p. 134 et seq.). Equitable estoppel is a broader doctrine than part performance. (Note, *supra*, 3 Stan.L.Rev. at p. 297.) All that is required for an equitable estoppel is a "serious" change of position and "unconscionable" injury. (*Monarco v. Lo Greco, supra*, 35 Cal.2d at p. 623.) Performance unequivocally referable to the agreement is not an indispensable part of the equation. (See *Carlson v. Richardson, supra*, 267 Cal.App.2d at pp. 208-209.)

If such a requirement were engrafted onto the equitable estoppel doctrine, then the doctrine would be abrogated in the context of *Marvin* agreements, because the sentiments which led the parties to cohabit would prevent a finding that their actions toward each other were motivated solely by their property agreements. *Marvin* noted that most cohabitation agreements are oral, and that cases had "expressly rejected defenses [to such agreements] grounded upon the statute of frauds." (*Marvin v. Marvin, supra*, 18 Cal.3d at p. 674, fn. 9, citing *Cline v. Festersen* (1954) 128 Cal.App.2d 380, 386-387 [275 P.2d 149] [equitable estoppel prevented reliance on statute of frauds].) In light of *Marvin*'s endorsement of "equitable remedies to protect the expectations of the parties to a nonmarital relationship" (*Marvin v. Marvin, supra*, at p. 684, fn. 25), the court's observations on the enforcement of oral cohabitation agreements can only be interpreted as an approval of the use of equitable estoppel by cohabitants in appropriate cases. Love does not vitiate Flo's equitable estoppel claim.

D. *Remaining Issues*

Flo's causes of action for declaratory relief, specific performance, constructive trust, and injunctive relief are also viable.[7]

█ *Marvin* held that rights under a cohabitation agreement may be established by way of an action for declaratory relief. (*Marvin* v. *Marvin, supra,* 18 Cal.3d at p. 675.)

█ Flo may properly elect to pursue specific performance of the property agreement with respect to assets such as the residence and family heirlooms for which damages may be an inadequate remedy. (Civ. Code, § 3387 [real property]; Rest.2d Contracts, § 360, com. b, at pp. 171-172 [personal property with sentimental value].) Since performance by Skip cannot be compelled, the action is one for "quasi-specific" performance. (See *Porporato* v. *Devincenzi, supra,* 261 Cal.App.2d at p. 674.) Such an action requires: (1) a contract that is sufficiently definite to be enforced; (2) a contract that is just and reasonable; (3) performance by the plaintiff; (4) failure to perform by the defendant; (5) adequate consideration; (6) an inadequate legal remedy; and (7) if the contract is oral and subject to a statute of frauds, a means such as estoppel of avoiding the statute. (*Id.* at pp. 674-675.) A trier of fact could find that all of these elements are present in Flo's case. Proof of a *Marvin* agreement for an interest in property contrary to record title must be made by "clear and convincing" evidence. (*Tannehill* v. *Finch* (1986) 188 Cal.App.3d 224, 228 [232 Cal.Rptr. 749].) A trial is needed to determine whether evidence of the property agreement in Flo's case is " ' " ' 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " ' " (*Ibid.*)

A constructive trust can be imposed on the estate's assets to provide for quasi-specific performance of the property agreement. (*Estate of Brenzikofer* (1996) 49 Cal.App.4th 1461, 1466-1467 [57 Cal.Rptr.2d 401]; *Porporato* v. *Devincenzi, supra,* 261 Cal.App.2d at p. 674.)

Distribution under the will can be enjoined pending the trial of Flo's claims. (*Estate of Anderson* (1977) 68 Cal.App.3d 1010, 1016 [137 Cal.Rptr. 727]; *Estate of Murphy* (1964) 225 Cal.App.2d 224, 229 [37 Cal.Rptr. 205].)

[7]Since the summary adjudication must be reversed on the merits as to all of Flo's causes of action, we need not reach her arguments that improper procedures were followed in connection with the motion. Also, we need not determine whether the evidence might support other causes of action, such as for the enforcement of inter vivos gifts, which are not included in the complaint and were not summarily adjudicated. If there is sufficient evidence to support additional causes of action, then Flo can seek to amend her complaint accordingly.

The judgment against Flo for rent based on her occupancy of the home after Skip's death must be reversed pending the trial of her entitlement to that property.

## III. CONCLUSION

The judgment against appellant on the quantum meruit cause of action is affirmed. The balance of the judgment is reversed. Appellant shall recover her costs on appeal.

Anderson, P. J., and Poché, J., concurred.

Respondents' petition for review by the Supreme Court was denied May 28, 1997.