[No. D009056. Fourth Dist., Div. One. July 26, 1990.]

CAROL ANITA HALL, Plaintiff and Respondent, v.
DAVID ALLEN HALL, as Executor and Trustee, etc., Defendant
and Appellant.

COUNSEL

McDougal and Associates, Edwin A. Johnson and Susan J. Boyle for Defendant and Appellant.

Norman Michael Cooley for Plaintiff and Respondent.

OPINION

FROEHLICH, J.—David Allen Hall (David), as executor and trustee of the estate and trust of his father, Aubrey Milton Hall (Decedent), appeals from a judgment granting Carol Anita Hall (Carol), Decedent's second wife, a life estate in the residential property which she shared with Decedent. He contends any oral agreement Carol made with Decedent allowing her a life estate in the residence is unenforceable and that specific performance is improper.

### FACTUAL AND PROCEDURAL BACKGROUND

The evidence viewed most favorably in favor of the judgment (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480]) reflects that on February 5, 1986, some months after the death of his wife of 49 years, Decedent executed a revocable trust and a quitclaim deed transferring the fee interest in his residence to himself as trustee of the trust. Under the terms of the trust, during his lifetime Decedent was the sole beneficiary, and at his death his sons were to share equally in the property.

Decedent met Carol in March of 1986. They began dating, and in early May 1986 he asked her to marry him. She expressed concerns to Decedent about the marriage, about spending her money, and about not having a place to live for the rest of her life. Decedent convinced her to marry him, to give up her job so they could spend most of their time together, to apply for Social Security at age 62 so they would have additional money, and to give him $10,000 so they would have money to start the marriage. In exchange he promised she could live in his home for the rest of her life. But for the agreement Carol would not have stopped working and would not have applied for early Social Security.

Carol and Decedent were married on July 16, 1986. In June she terminated her employment, moved in with Decedent, and applied for Social Security upon reaching age 62. She used her personal funds to finance a trip to Ohio soon after the marriage and gave Decedent other funds, aggregating more than the $10,000 they had agreed upon.

In October 1986, Decedent and Carol met with Pamela Ferrie Estabrook (Estabrook), the attorney who had prepared the trust document for Decedent. Carol testified that during the meeting Decedent authorized Estabrook to prepare an amendment to the trust which would allow Carol to live in the house for the rest of her life, and that he also asked Estabrook to prepare a new will for Carol. Estabrook testified that when the couple came to see her she was uncertain what Decedent wanted, but he said he wanted to provide a residence for Carol in the event of his death and also asked her to prepare a simple will for Carol. She testified that during a later telephone call he authorized her to prepare a trust amendment granting a life estate in his residence to Carol, and she prepared a draft amendment and sent it to him. She stated Decedent later told her he had some questions regarding the amendment and the will and would make an appointment with her sometime later. Decedent died unexpectedly on January 16, 1987, without signing the amendment.

On March 11, 1987, Carol filed a nine-count complaint against Decedent's sons, David and Aubrey Milton Hall, Jr. (Aubrey, Jr.), as individuals and in their capacities as cotrustees of Decedent's trust and co-executors of his estate, seeking a determination of her entitlement to a life estate in the residence and other relief. In trial before the court, David and Aubrey, Jr., were granted judgment at the close of Carol's case as to certain of her contentions related to personal property and on her claim to being a pretermitted spouse. After full trial, however, Carol prevailed in her action to establish a life estate in the realty, the court determining that the doctrine of partial performance was available to avoid statute of frauds problems otherwise applicable to the oral agreement the court found established by the

evidence. David appeals as sole trustee and executor, Aubrey Jr., having resigned his positions.

DISCUSSION

I

██ David contends the oral agreement between Decedent and Carol is unenforceable because it was not in writing and signed by both parties. ██ At the outset we should focus upon which of several possibly applicable statute of frauds provisions is pertinent to this case. David cites Civil Code[1] section 5311 (premarital agreements must be in writing), section 5110.730 (transmutation of property between spouses must be in writing), and Probate Code section 150 (a)(3) (contract to make a will must be in writing). We believe the applicable statute of frauds provision is section 5311, dealing with premarital agreements. The evidence does not support, and the court did not find, any actual transmutation of property between Decedent and Carol. The determination was that an agreement had been entered under the terms of which a transmutation *would* occur. Similarly, the factual determination of the court rules out a conclusion that this was an agreement to make transfers by way of will. It was an agreement to modify an existing trust so as to convey to Carol a life estate in the residential realty. We must, therefore, examine the provisions of sections 5300 through 5317, which constitute the codification in California of the Uniform Premarital Agreement Act, adopted in 1985.

II

The Uniform Premarital Agreement Act (the act) was added by the Legislature in 1985 and is effective as to any premarital agreement executed on or after January 1, 1986. (§ 5302.) The general purpose of the act is to make the law regarding premarital agreements uniform among the states adopting it. (§ 5301.) To date the act has been adopted in 14 states. (See Table of Jurisdictions Wherein Act Has Been Adopted, West's Ann. Civ. Code, ch. 2, Uniform Premarital Agreement Act (1990 pocket supp.) pp. 41-42.)

Under the act " '[p]remarital agreement' means an agreement between prospective spouses made in contemplation of marriage and to be effective upon marriage." " 'Property' means an interest, present or future, legal or equitable, vested or contingent, in real or personal property, including income and earnings." (§ 5310.)

---

[1] All statutory references are to the Civil Code unless otherwise specified.

"Parties to a premarital agreement may contract with respect to all of the following:

"(1) The rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located.

"(2) The right to . . . use . . . property." (§ 5312.)

Since the agreement between Carol and Decedent was made in contemplation of marriage and respected a right to property, it is governed by the act.

At the outset, we deal with Carol's contention that the act is actually not a statute of frauds. Acknowledging that the agreement she seeks to enforce was never committed to writing, she contends the act simply does not pertain to oral agreements. This argument is based on the following syllogism: (1) the act applies only to premarital agreements as defined in the act; (2) under section 5311 "[a] premarital agreement shall be in writing and signed by both parties"; and (3) therefore, definitionally, an agreement not in writing and signed by both parties is not a premarital agreement and not covered by the act. This somewhat startling argument finds some support in legislative materials generated by Senate and Assembly committees during consideration of the act which describe, among other things, situations excluded from the act. In several places these reports state the act does not deal with agreements between persons who cohabit but do not contemplate marriage or do not marry, "[n]or does [the act] provide for postnuptial or separation agreements *or oral agreements.*" (Assem. Subcom. on Administration of Justice, Analysis of Sen. Bill No. 1143 (1985-1986 Reg. Sess.) as amended July 18, 1985, p. 3; Assem. Office Research, 3d reading analysis of Sen. Bill No. 1143 (1985-1986 Reg. Sess.) p. 1., italics added.)

Literally, this comment suggests exclusion of all oral agreements from the act's coverage, relegating the scope of the new law to a governance only of the terms of written agreements. We cannot, however, accept this novel proposition. First, our research of authority from the several other states which have adopted the uniform act fails to reveal any similar interpretation. Second, nothing in the legislative or uniform commission reports expands upon or otherwise explains the comment about "oral agreements." Finally, the general tenor of all related materials leads to the conclusion that the new act was intended to be a statute of frauds law, replacing and not substantially changing the existing statute of frauds provision governing premarital agreements. For instance, the preamble to the Senate Committee

Report on the bill states that the new act would replace existing statute of frauds provisions relative to premarital agreements, and that it would be "similar to existing law." (Legis. Counsel's Dig., Sen. Bill No. 1143, 4 Stats. 1985 (Reg. Sess.) Summary Dig., p. 480.) The Report of the Assembly Subcommittee states that the new act "[r]equires a premarital agreement to be in writing and signed by both parties." (Assem. Subcom. on Administration of Justice, Analysis of Sen. Bill No. 1143, *supra*, as amended July 18, 1985, p. 2.) The most detailed analysis of the law available to interested parties at the time it was being considered by the Legislature was a 23-page report prepared as of May 3, 1984, by the assistant executive secretary of the California Law Revision Commission. Nothing in this analysis suggests any intention that the act was not to preclude enforceability of oral agreements, generally. Typical of references to the issue is the simple statement in the prefatory note to the analysis that "Section 5312 requires that a premarital agreement be in writing and signed by both parties." (Cal. Law Revision Comm. Mem. (May 3, 1984), p. 3, incorporating tent. draft of Uniform Premarital Agreement Act.)

We do not, therefore, accept the proposition that in rewriting the California statute of frauds provision relating to premarital agreements the Legislature intended to regulate the effectiveness of agreements which to some extent had been reduced to writing, but to *deregulate* entirely the writing requirement in the case of agreements which were totally oral. We would need more than a "throw away" line in legislative materials to come to such a surprising conclusion. We rule that the act is a statute of frauds law, requiring that the agreement be in writing to be enforceable, and hence proceed to the core issue in this case, which is whether traditional exceptions to the statute of frauds remain viable in terms of the new act.

### III

New section 5311, which provides that "[a] premarital agreement shall be in writing and signed by both parties," replaced former section 5134, which in turn was a reenactment without change of an earlier section enacted in 1872. (See Historical Note, West's Ann. Civ. Code (1990 pocket supp.) § 5134, p. 43; Historical Note, West's Ann. Civ. Code (1983 ed.) § 1534, p. 296.) Former section 5134 required: "All contracts for marriage settlements must be in writing, and executed and acknowledged or proved in like manner as a grant of land is required to be executed and acknowledged or proved." ■ Exceptions "taking the case out of the statute" have traditionally been recognized as to all statute of frauds provisions. Thus, a substantial change of position in reliance on an oral agreement will estop reliance on the statute (1 Witkin, Summary of Cal. Law (9th ed. 1987)

Contracts, § 325, pp. 305-306), and an actual transfer of realty constituting partial performance of the oral agreement will satisfy the proof element otherwise reflected in the requirement of a writing. (*Id.* at §§ 318-319, pp. 299-301.)

These exceptions were recognized in the enforcement of premarital agreements under the former law. It was well established that marriage itself or mere payment of money was not sufficient performance to take an oral prenuptial agreement out of the writing requirement of the statute, because these acts could reasonably be expected in any marriage. (*Peek* v. *Peek* (1888) 77 Cal. 106, 108 [19 P. 227]; *Trout* v. *Ogilvie* (1919) 41 Cal.App. 167, 171-172 [182 P. 333] [Wife's acts of marrying husband and paying off encumbrances on his property were not sufficient performance to require enforcement of husband's oral prenuptial promise to will property to her.]) Relief might be granted, however, when the party seeking to enforce the oral agreement performed his part of the bargain and in so doing irretrievably changed his position. "Relief because of the partial or full performance of the contract is usually granted in equity on the ground that the party who has so performed has been induced by the other party to irretrievably change his position and that to refuse relief according to the terms of the contract would otherwise amount to a fraud upon his rights." (*Busque* v. *Marcou* (1952) 147 Me. 289 [86 A.2d 873, 876, 30 A.L.R.2d 1411]; see also *O'Brien* v. *O'Brien* (1925) 197 Cal. 577 [241 P. 861].) For relief to be granted because of partial performance of an oral antenuptial contract, the acts which are relied upon must be unequivocally referable to the contract. Acts which, although done in performance of the contract, admit to an explanation other than the contract (such as the performance of husbandly or wifely duties) are not generally acts of partial performance which will take the agreement out of the statute of frauds. (*Trout* v. *Ogilvie, supra,* 41 Cal.App. at p. 172.)

 The trial court, on the basis of substantial evidence, held that the oral agreement to transfer a life estate to Carol was enforceable, and taken out of the statute of frauds, because of partial performance of the agreement by Carol. It found that Carol would not have married without some agreement with respect to her financial security; that she quit working and took early Social Security in performance of her part of the bargain; and the payments she made to Decedent were consistent with their agreement.

Certainly under the former law this finding is sustainable. Marrying Decedent and paying him $10,000 in accordance with the agreement would not, standing alone, have been sufficient performance to take the case out of the statute of frauds. But by her additional acts of stopping work and applying for early Social Security Carol irretrievably changed her position

in reliance on Decedent's promise to provide her a house for the rest of her life. Her performance constituted detrimental reliance on his promise sufficient to allow enforcement of the contract under the former law.

The issue, then, is whether the partial performance exception remains applicable under the act. We rule that the exceptions to the statute recognized under the former law are equally applicable to the Uniform Premarital Agreement Act. It is true that the act does not specifically reference any of the traditional exceptions to the statute of frauds. Equally true, however, is that the act does not preclude them. Also, nothing in any of the legislative materials nor in the reports of the Commissioners on Uniform State Laws makes any reference to the exclusion of traditional exceptions. To the contrary, the report of the executive secretary of the California Law Revision Commission recognized the continued viability of exceptions to the statute of frauds: "It appears that acts that take the agreement out of the writing requirement of Section 5312 are recognized. See, e.g., *Ayoob* v. *Ayoob*, 74 Cal.App.2d 236 . . . (oral agreement evidenced by subsequent written memorandum; Estate of Pratt, 81 Cal.App.2d 348 . . . (oral agreement fully confirmed, verified and executed after marriage)." (See Cal. Law Revision Comm. Mem. (May 3, 1984), p. 10, incorporating tent. draft of Uniform Premarital Agreement Act.) We must assume the framers of the uniform act were well versed in the statute of frauds and knew about the exceptions applied to the writing requirement. ■ ■■ ■■ ■■ Since the Commissioners on Uniform State Laws apparently recognized the existence of traditional exceptions, and the reports of legislative committees commenting on the law make no suggestion of exclusion of the exceptions, we must assume it was intended such exceptions continue to be viable.[2] We therefore find the trial court's reliance upon partial performance as removing the case from the statute to be justified.

## IV

■■ David's final contention is that the grant of specific performance is improper because the oral agreement was uncertain in its terms and scope, enforcement of the oral agreement would be inequitable and the judgment rendered was excessive.

Under section 3390, subdivision 5, an obligation cannot be specifically enforced if its terms "are not sufficiently certain to make the precise act

---

[2] The familiar rule of statutory construction is stated in 58 California Jurisprudence 3d, Statutes, section 92, pages 446-447 as follows (citations omitted): "It will be assumed that the legislature, in enacting or amending a statute, knew of existing laws, that it was familiar with the common-law rules and the acts of previous legislatures, that it had knowledge of existing judicial decisions construing the same or related statutes and enacted new statutes and amendments or reenacted statutes in the light thereof, and that its intent was to maintain a consistent body of rules."

which is to be done clearly ascertainable." Here, the terms of the agreement were sufficiently certain to allow specific performance.

Carol testified Decedent promised she could live in the house for the rest of her life. Attorney Estabrook testified that when Carol and Decedent came to see her, Decedent told her he wanted to provide a residence for Carol in the event something happened to him. She said in a later telephone conversation he authorized her to prepare an amendment to the trust granting Carol a life estate in the residence.[3] Estabrook testified she prepared a draft of the amendment for Decedent to review and sent it to him. He subsequently told her he wanted to ask her some questions and would make a later appointment, but died without signing the agreement. This testimony is sufficient evidence that Decedent intended for Carol to have a life estate in the house. Decedent's intent under the agreement was adequately discernible for the court to grant specific performance.[4]

David argues allowing a life estate for Carol is harsh and inequitable to innocent third parties since the trust's beneficiaries may be denied their inheritance for many years, whereas Decedent and Carol were only married for a few months. He also argues the judgment rendered was excessive.

"It is to be presumed that the breach of an agreement to transfer real property cannot be adequately relieved by pecuniary compensation. In the case of a single-family dwelling which the party seeking performance intends to occupy, this presumption is conclusive." (§ 3387.) ██ "It is settled that the fairness and reasonableness of a contract is determined from the circumstances as they existed at the time of the making of the contract." (*Ellison* v. *Ventura Port District* (1978) 80 Cal.App.3d 574, 582 [145 Cal.Rptr. 665].) ██ At the time Decedent and Carol entered into their agreement they surely anticipated more time together than the few months they enjoyed. Carol detrimentally relied on Decedent's promise that she could continue to live in his home if he predeceased her. Her expectancy interest can only be protected by an order of specific performance. Enforcement of the life estate is not excessive or inequitable to the individuals who will ultimately inherit the property.

---

[3] Under Evidence Code section 1261, subdivision (a), "[e]vidence of a statement is not made inadmissible by the hearsay rule when offered in an action upon a claim or demand against the estate of the declarant if the statement was made upon the personal knowledge of the declarant at the time when the matter had been recently perceived by him and while his recollection was clear."

[4] Since the draft amendment was not signed, it of course has no effect in taking the agreement out of the statute of frauds. It is evidence, however, of Decedent's intent regarding the terms of the agreement as expressed to Estabrook.

## DISPOSITION

The judgment is affirmed.

Kremer, P. J., and Nares, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 25, 1990.