[Nos. G024572, G025498. Fourth Dist., Div. Three. Apr. 11, 2001.]

In re the Marriage of AHMAD and SHERIFA SHABAN.
AHMAD SHABAN, Appellant, v.
SHERIFA SHABAN, Respondent.

**COUNSEL**

Schwamb & Stabile, Mark A. Hewitt; Hart, King & Coldren, Robert S. Coldren, Richard P. Gerber; and James R. Goff for Appellant.

Law Offices of Marjorie G. Fuller, Marjorie G. Fuller; and Mark S. Millard for Respondent.

**OPINION**

**SILLS, P. J.**—This appeal presents a situation that not only reaches the outer limits of the ability of a prospective married couple to incorporate by reference terms into a prenuptial agreement, but so far exceeds those limits as to fall off the edge. It is one thing for a couple to agree to basic terms, and choose the system of law that they want to govern the construction or interpretation of their premarital agreement. (See Fam. Code, § 1612, subd. (a)(6) ["Parties to a premarital agreement may contract with respect to . . . [¶] . . . [¶] The choice of law governing the construction of the agreement"].) It is quite another to say, *without any agreement as to basic terms,* that a marriage will simply be governed by a given system of law and then hope that parol evidence will supply those basic terms.

Here, a couple who married in Egypt in 1974 had their marriage dissolved after living in the United States for about 17 years. In the course of the

proceedings, the husband asserted that the couple had a written prenuptial agreement. The document that he claimed was the prenuptial agreement was a one-page piece of paper written in Arabic and signed by him and his future father-in-law at the time of the wedding. (The bride did not sign it; her father signed it as her "representative.") The record contains three English translations of the document, and, with the exception of the recitation of a dowry arrangement, none of the translations sets forth any substantive matter. At trial, the husband attempted to introduce parol evidence in the form of an expert witness who was prepared to testify that certain language in the document signified an intention on the part of the husband and wife to have their marriage, including property relations at the time of any divorce, governed by "Islamic law." The trial judge refused to allow the expert to testify, held there was no prenuptial agreement (he found the document was really a marriage "certificate"), and proceeded to apply California community property law to the earnings and acquisitions of the parties.

We affirm the property division set forth in the judgment. It is not that a document in a foreign language is not a fit subject for parol evidence. It obviously is. (See *Reamer v. Nesmith* (1868) 34 Cal. 624, 628.) We affirm because the requirement that prenuptial agreements be in writing under California law is a statute of frauds provision, and to satisfy the statute of frauds, a writing must state with reasonable certainty what the terms and conditions of the contract are. An agreement whose only substantive term in any language is that the marriage has been made in accordance with "Islamic law" is hopelessly uncertain as to its terms and conditions. Had the trial judge allowed the expert to testify, the expert in effect would have written a contract for the parties.

The husband also mounts a challenge to an attorney fee order for fees on this appeal. The argument is based in part on the novel idea that the fee award was excessive because appellate practice consists, in the words of one of the husband's briefs, of "simply chang[ing] the trial points and authorities into an appellate format." We reject that contention in the strongest possible terms.

FACTS

Ahmad and Sherifa Shaban were married in the Arab Republic of Egypt in February 1974. They came to the United States in the early 1980's, and dissolved their marriage in 1998 in the Superior Court of Orange County. At trial, Ahmad contended that a one-page document written in Arabic on what appears to be a form (there is Arabic writing in the blanks of the form) constituted a prenuptial agreement governing the disposition of any property acquired by either of them during the marriage. We set out in the margin the

complete text of the translation of the document that, to the degree there is any difference among the three, best favors Ahmad's position.[1]

---

[1]The translation below looks the most like it might be a premarital contract. The other two translations are laid out like a form document, with material filled in the blanks:

"ARAB REPUBLIC OF EGYPT
"IN THE NAME OF GOD THE COMPASSIONATE AND MERCIFUL
MARRIAGE CONTRACT

"No. 673013
"On Saturday 1, Safer 1394 (Hijra), corresponding to February 23, 1974, in my presence and by my ministration Abdel-Hameid Mohamed El-Basstawy, Notary of El-Zamalek, depending to the Abdein Court for personal status for Guardienship [*sic*] over persons at home no. 31, located at Ahmed Hesmat St. El-Zamalek. The following marriage deed was concluded:
**"The Bridegroom:**
"Mr. Ahmed Mostafa Shaban, apt to age, physician, Egyptian, born on July 13, 1949, at the United States of America, domiciled at 58, El-Esraa St. El-Mohandessin-El-Dokki, holder of Identity Card No. 21357, issued on 10.12.1972, at Embaba, (his mother's name is Hayat El-Nowfos Mohamed El-Said).
**"The Bride:**
"Miss Sherifa Abdel Aziz Saeed, virgin, apt of age, she given proxy to her father Mr. Abdel Aziz Mohamed Saeed and to receive the advanced part of the dowry and the deed, holder of Identity Card No. 2235, issued from Kasr El-Nil, on 14.8.1972; She is employee, Egyptian, born on 23.2.1950, in Cairo, domiciled at 31, Ahmed Heshmat St. El-Zamalek, holder of Identify Card No. 16648, issued on 27.2.1972 at Kasr El-Nil (her mother's name is Saadia Emam Shaban). ·
**"The Dowry:**
"The dowry is L.E. 500 and 250 piasters (five hundred pounds and twenty five piasters) the advanced part amounting to P.T. 250 (twenty five piasters) has been paid to the wife's proxy in the sitting, and the deferred amounting to L.E. 500 (five hundred pounds) is in the faith of the husband payable at nearer maturity (divorce or death).

"The above legal marriage has been concluded in accordance with his Almighty God's Holy Book and the Rules of his Prophet to whom all God's prayers and blessings be, by legal offer and acceptance from the two contracting parties.

"The foregoing was concluded after the two parties had taken cognizance of the legal implications and after ascertaining that there are no legal or formal impediments preventing their marriage, and that the bride does not receive any salary from the Government and does not possess any funds exceeding L.E. 200, and that the bride and bridegroom are of age.

"This contract has been witnessed by
**"First witness:**
"Mr. Mohamed Hamedy Abu Zeid, Ambassador, Egyptian, born on 20.3.1919, at El-Sudan, domiciled at 31 Mohamed Mazhar St, El-Zamalek, holder of Identity Card No. 16160, issued on 31.7.1973, at Kasr El-Nil.
**"Second witness:**
"Mr. Mostafa Kamal Emam Shaban, Professor Engineer at Ein-Shams, Egyptian, born on 18.12.1922, at El-Gharbia, domiciled at 58 El-Esraa, El-Mohandessin-El-Dokki holder of Identity Card No. 7818, issued on 1.8.1962, at Embaba district.

The document designates the bridegroom and the bride, and then refers to a dowry (often called a "mahr") of 500 Egyptian pounds and 25 piasters due from the husband to wife's "proxy," i.e., her father. It states that a token portion of the dowry (the 25 piasters) had already been paid, with the balance due "at nearer maturity (divorce or death)." (At oral argument, Ahmad's counsel acknowledged that the amount of balance due on the dowry was now equivalent to about $30.) The document then describes two witnesses, one of whom was an ambassador, and the other an engineer.

Then comes certain language, which forms the basis of Ahmad's appeal. One translation goes: "The above legal marriage has been concluded in Accordance with his Almighty God's Holy Book and the Rules of his Prophet to whom all God's prayers and blessings be, by legal offer and acceptance from the two contracting parties." Another translation reads: "Legal marriage concluded in Accordance with God's Book and the precepts of His Prophet and with the mutual agreement of the husband and the wife's representative."[2] After that there is an oblique reference to the "two parties [having] taken cognizance of the legal implications." The document was signed by the husband and the "wife's representative" or "agent."

At trial, Ahmad made an offer of proof that the phrase signified a written intention by the parties to have the property relations governed by "Islamic law," which provides that the earnings and accumulations of each party during a marriage remain that party's separate property. (In practical effect, that would mean that there would be no community interest in Ahmad's medical practice or retirement accounts; his trial brief indicated that the real

---

"The present contract has been drawn up in copies:
- the 1st to the Husband
- the 2nd to the Wife's proxy
- the 3rd to the civil register office.

"Due fees has been settled
The witnesses      :(signed)
The Husband        :(signed)
The Wife's proxy   :(signed)
The Notary         :(signed)
**"Seal: Ministry of Justice."**
    [2]The third translation is: "This being a lawful wedding under the Holy Book of Good [*sic*] and the Tradition of His Messenger God's Peace and Blessing be on him and following the legal offer and acceptance duly issued by the husband and the agent for the wife, it being asserted that the parties had not previously married . . . ."

property of the parties, put in joint names, would be divided between them.) The trial judge, however, concluded that the document was a marriage "certificate" and not a written prenuptial agreement, and therefore did not allow Ahmad's expert to testify.[3] Concluding that there was no prenuptial agreement, the court entered a judgment applying California community property law to the acquisitions during the marriage and dividing what it then held was the community estate. Ahmad has appealed from the property division portion of the judgment, arguing, among other things, that the trial judge erred in excluding the expert testimony. At oral argument he conceded that if California law were to govern, the court's division of property was correct.

## DISCUSSION

### The Parol Evidence Was Properly Excluded Because It Was Offered to Establish the Substance of the Alleged Agreement

■ At the outset, it is important to distinguish between the parol evidence rule and the statute of frauds. (See generally *Ellis v. Klaff* (1950) 96 Cal.App.2d 471, 475-476 [216 P.2d 15] [comparing and contrasting the two rules: parol evidence is a principle of substantive law; the statute of frauds is designed to prevent perjury and fraud].) Parol evidence, of course, may be received to interpret a term of art used within a contract. (See *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; cf. *ACL Technologies, Inc. v.*

---

[3]In this appeal, Ahmad complains of the considerable expense of retaining the expert (about $25,000, as the expert was flown in from London), only to have the trial court refuse to hear the testimony. The question thus arises as to whether the expense might have been saved. It is tempting to suggest that the issue of whether the expert would be allowed to testify in the first place, being strictly one of law, was perfectly suited for a motion in limine made well prior to trial (contrary to common perception, there is no rule against making a motion in limine except on the day of trial), so Ahmad could have spared himself the expense of flying the expert out for trial by filing such a motion. But that ignores the expense of making the motion itself, which would decrease any savings it might accomplish. The trial judge might also have allowed the expert to testify, subject to having the testimony struck later. That, at least, would have saved one of the parties the expense of bringing the expert back in the event of reversal, though it would have prolonged the trial and forced Sherifa to call her own expert, so, again, there might not have been any net savings. It would also have indirectly affected the trial court's ability to hear other cases and matters. While there appears no easy solution to the question, the issue once again illustrates the need for family courts to be sensitive to the circumstances and means of the litigants. (See *In re Marriage of Brantner* (1977) 67 Cal.App.3d 416, 422 [136 Cal.Rptr. 635].)

*Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1793 [22 Cal.Rptr.2d 206] [*Pacific Gas,* properly understood, is directed to situations where parties give words special meanings or use a "code"].)

But independent of the parol evidence rule, the statute of frauds requires that the contract itself not be the *product* of parol evidence. As our Supreme Court explained in an early case turning on the statute of frauds: "The whole object of the statute would be frustrated if any substantive portion of the agreement could be established by parol evidence." (*Craig v. Zelian* (1902) 137 Cal. 105, 106 [69 P. 853].)

Regardless of whether we are dealing with California law before or after our Legislature adopted the Uniform Premarital Agreement Act in 1985, California has had in place, since 1872, a statute of frauds provision for prenuptial agreements. (See *Hall v. Hall* (1990) 222 Cal.App.3d 578, 585 [271 Cal.Rptr. 773].) The current incarnation of that statute is Family Code section 1611 ("A premarital agreement shall be in writing and signed by both parties."). At the time of Ahmad and Sherifa's marriage, it was former Civil Code section 5134 ("All contracts for marriage settlements must be in writing and executed and acknowledged or proved in like manner as a grant of land is required to be executed and acknowledged or proved" [Stats. 1969, ch. 1608, § 8, p. 3343]).

Often, prenuptial agreement cases have turned on whether a given *oral* agreement had been sufficiently performed to take it out of the writing requirement. (See *Hall v. Hall, supra,* 222 Cal.App.3d at p. 586 and authorities collected therein.) But in any event, there never has been any question that the writing requirement is a "statute of frauds law." (*Id.* at p. 585; see also *Barton v. Barton* (1938) 10 Cal.2d 578, 580-581 [75 P.2d 1057] [no enforceable prenuptial agreement because letters of a "social and sentimental nature" were insufficient to satisfy statute of frauds]; *Hughes v. Hughes* (1920) 49 Cal.App. 206, 208-210 [193 P. 144] [statute of frauds barred enforcement of oral promise by prospective husband to give wife diamond ring, diamond stickpin, ermine coat and automobile if she would marry him, even though parties were, indeed, married afterwards].)

In the context of the requirement of a writing for real estate transactions (see Civ. Code, § 1624), California courts have, since *Ellis v. Klaff, supra,* 96 Cal.App.2d at pages 476-477, adopted the principles set forth in section 207 of the Restatement of Contracts, which provides that to be sufficient, the required writing must state "with reasonable certainty . . . [¶] . . . [¶] . . . the terms and conditions of all the promises constituting the contract . . . ." (See also *Ontario Downs, Inc. v. Lauppe* (1961) 192 Cal.App.2d 697, 702 [13

Cal.Rptr. 782]; *Rivers v. Beadle* (1960) 183 Cal.App.2d 691, 696 [7 Cal.Rptr. 170]; *Burge v. Krug* (1958) 160 Cal.App.2d 201, 207 [325 P.2d 119]; *Ferrara v. Silver* (1956) 138 Cal.App.2d 616, 618 [292 P.2d 251]; *Potter v. Bland* (1955) 136 Cal.App.2d 125, 129 [288 P.2d 569].) As Justice Lillie noted in *Burge*, the writing "considered alone," must express "the essential terms with sufficient certainty to constitute an enforceable contract," hence "recovery may not be predicated upon *parol proof of material terms omitted from the written memorandum.*" (*Burge v. Krug, supra,* 160 Cal.App.2d at p. 207, italics added.)

There is no reason the same requirement that the writing evidence with reasonable certainty the terms of the contract should not also apply to prenuptial agreements. The policy considerations behind the statute of frauds apply, if anything, with even more force to prenuptial agreements. Such agreements will often be litigated in the highly emotional aftermath of the breakup of an intimate relationship, and will involve subject matter far more personal and more likely to "strike home" than an impersonal real estate transaction. The temptation for selective memory is usually greater in domestic relations cases than it is in real estate deals.

Given the need for reasonable certainty of terms and conditions,[4] it is evident that the phrases "in Accordance with his Almighty God's Holy Book and the Rules of his Prophet" and "two parties [having] taken cognizance of the legal implications," no matter how much they might indirectly indicate a desire to be governed by the rules of the Islamic religion, simply bear too attenuated a relationship to any actual terms or conditions of a

---

[4]Indeed, even the term "Islamic law" is relatively uncertain. There are at least four schools of interpretation of Islamic law: the Shafi'i, Hanafi, Maliki, and Hanbali. (See Venkatraman, *Islamic States and the United Nations Convention on the Elimination of All Forms of Discrimination Against Women: Are the Shari'a and the Convention Compatible?* (1995) 44 Am. U. L.Rev. 1949, 1965-1970 (hereinafter Venkatraman, *Islamic States and the United Nations*).) The legal system in various Islamic countries will often be influenced by one school or the other. (*Ibid.*) Egypt, for example, has been influenced by both the Hanafi and Maliki schools. (*Id.* at p. 1985 ["Maliki interpretations, particularly, prevailed over the predominant Hanafi ideology in influencing divorce reform."].) Indeed, one commentator has observed that England has rejected any attempt to give effect to Islamic "personal law" because of the varieties of competing schools within Islam. (See Snethen, *The Crescent and the Union: Islam Returns to Western Europe* (2000) 8 Ind. J. Global Legal Stud. 251, 264 [England rejected recognition of Muslim "personal law" because "there were so many variants of Muslim personal law that choosing from among them was untenable"].)

Here, not only would the expert have had to opine, based primarily on one phrase in the document and his own knowledge of Egyptian society and law in the early 1970's, whether the parties agreed to have their marriage governed by a school of doctrine disembodied from any system of national law (general "Islamic law" as distinct from codified Egyptian law or the law of some other nation state), but if he concluded that it was the former, he would have had to opine what particular school of Islamic law was to govern the contract.

prenuptial agreement to satisfy the statute of frauds. (The reference to "legal implications" is particularly meaningless, because all marriages bear "legal implications" the world over.[5] ) The only thing that bears any resemblance to a material term is the lonely dowry provision.[6] Indeed, all three translations of the document provide far more information about the two witnesses to the wedding than they provide about any agreement of the parties.

Because the trial court did not err in excluding the parol evidence in this case, there is no need to address the question of whether any such agreement was against public policy. It is enough to remark that the need for parol evidence to supply the material terms of the alleged agreement renders it impossible to discuss any public policy issues. After all, how can one say that an agreement offends public policy when it is not possible even to state its terms?

### The Attorney Fee Orders Were Proper

In a related appeal (G025498) which we now consolidate with Ahmad's original appeal (G024572), Ahmad attacks two postjudgment attorney fee orders, one for $55,000 and one for $2,500. The $55,000 award was to provide Sherifa with attorney fees for *this* appeal, after Ahmad had filed a

---

[5]As Professor Wardle notes, Aristotle pointed out that setting the legal age of marriage was the " 'first care' " of the prudent legislator, and thus it is not surprising that marriage regulation is the subject of law making "[n]o matter how sophisticated or primitive the national legal system." (Wardle, *International Marriage and Divorce Regulation and Recognition: A Survey* (1995) 29 Fam. L.Q. 497, 500.)

[6]And even the dowry provision illustrates how much parol evidence was offered to *write* the contract of the parties, as distinct from merely interpreting a phrase within it. Dowries are often a means by which certain systems of religious law accommodate inequalities between husband and wife in the right to divorce. (Compare *In re Marriage of Noghrey* (1985) 169 Cal.App.3d 326, 329, fn. 2 [215 Cal.Rptr. 153] [dowry compensates wife for husband's right to divorce at will under Jewish law] with Venkatraman, *Islamic States and the United Nations, supra,* 44 Am. U. L.Rev. at p. 2001 [same idea under Islamic law].) The idea seems to be that although the husband has the right to divorce at will while the wife is confined to certain grounds, the exercise of that right will cost him. (See also Coulson, A History of Islamic Law (Edinburgh U. Press 1964) at pp. 207-208 ["A further device formulated by the law to safeguard the wife's position was that of deferred dower. Payment of a portion of the dower could be postponed by agreement of the parties until the termination of the marriage, and if the amount so stipulated was high enough it would obviously provide an effective brake upon the capricious exercise of the right of repudiation by the husband."].) Systems of marital law tend to be based on internally consistent sets of ideas, so grafting one part of another system may create anomalies. In California courts, for example, dowry provisions have not fared well by themselves. (See *In re Marriage of Dajani* (1988) 204 Cal.App.3d 1387 [251 Cal.Rptr. 871] [dowry provision unenforceable where beneficiary of provision sought divorce]; *In re Marriage of Noghrey, supra,* 169 Cal.App.3d 326 [same].) If Sherifa had known that she wouldn't be entitled to a dowry in the event of a divorce, would she have made the deal anyway? To ask such a question demonstrates how much the whole enterprise of creating the contract out of parol evidence is an exercise in speculation.

notice of appeal and bonded around the attorney fee award in the judgment, which was for fees incurred at trial. (That particular fee award, for $56,000, has not been challenged in this appeal.) The $2,500 fee award was for the fees incurred in opposing a petition for modification of the judgment.

■ Ahmad's main argument against these awards is that, given the division of an estate worth some $3 million, Sherifa had so many assets that she didn't *need* any money for attorney fees. The argument fails for three reasons:

First, the nature of Ahmad's position in this appeal was that the property division in the judgment was incorrect. Had Ahmad prevailed on that point—indeed, if he yet prevails assuming that the Supreme Court were to reverse today's judgment—the assets that he now claims are his wife's to use to pay attorney fees could end up being his.

Second, just because Ahmad had a legal right to bond around a judgment doesn't mean that the court could not compensate Sherifa for her effective lack of liquidity to finance the defense of the judgment on appeal. (See *Hunter v. Hunter* (1962) 202 Cal.App.2d 84, 92-93 [20 Cal.Rptr. 730] [upholding attorney fees for appeal in case where wife was without funds to pay appellate counsel].) Unless there was an award of fees prospectively, Sherifa would have been without means to present her case in this court.

Third, the record contains some evidence of Ahmad's recalcitrance in transferring various assets to Sherifa. The trial court thus had evidence, in addition to the bond staying execution of the judgment, that Ahmad was determined to wage the litigation in such a way as to deprive Sherifa of liquid assets pending the appeal.

■ The *amount* of the fee award for defending this appeal is, in our judgment, reasonable as well, but this issue requires a little more explication. Ahmad doesn't really argue that the amount is excessive in terms of the combination of traditional factors such as time spent, difficulty of subject matter, or experience and expertise of counsel. (See generally *In re Marriage of Cueva* (1978) 86 Cal.App.3d 290, 296 [149 Cal.Rptr. 918].) Instead, he makes this, rather remarkable argument: It was excessive because "most of the work that would have to be done by appellate counsel on appeal had already been done in connection with the trial."

It is a contention the members of this panel, or any appellate or reviewing court, are particularly situated to reject out of hand. So let us do so.

Appellate work is most assuredly not the recycling of trial level points and authorities. Of course, the orientation of trial work and appellate work is

obviously different (see generally Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2000) ¶ 1:12, pp. 1-2 to 1-3 [noting difference between determination of case on merits and examination for error]), but that is only the beginning of the differences that come immediately to mind.

For better or worse, appellate briefs receive greater judicial scrutiny than trial level points and authorities, because three judges (or maybe seven) will read them, not just one judge. The judges will also work under comparatively less time pressure, and will therefore be able to study the attorney's "work product" more closely. They will also have more staff (there are fewer research attorneys per judge at the trial level) to help them identify errors in counsel's reasoning, misstatements of law and miscitations of authority, and to do original research to uncover ideas and authorities that counsel may have missed, or decided not to bring to the court's attention.

Additionally, because there is no "horizontal stare decisis" within the Court of Appeal, intermediate appellate court precedent that might otherwise be binding on a trial court (see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]) is not absolutely binding on a different panel of the appellate court. So, in appropriate and rare cases, appellate court precedent is open for reexamination and critical analysis. Along the same lines, appellate counsel must necessarily be more acutely aware of how a given case fits within the overall framework of a given area of law, so as to be able to anticipate whether any resulting opinion will be published, and what effect counsel's position will have on the common law as it is continuously developed.

Then there is the simple matter of page limitations. Appellate courts are more liberal than trial courts as to the number of pages counsel are allowed. (Compare Cal. Rules of Court, rule 313(d) [limit of 15 or 20 pages for trial level points and authorities without necessity of obtaining permission to exceed limit] with rule 15(e) [limit of 50 pages for appellate briefs without necessity of obtaining permission to exceed limit].) Granted, the extra length of the "briefs" in appellate and reviewing courts is not always a good thing (cf. 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 600, p. 634, quoting *King v. Gildersleeve* (1889) 79 Cal. 504, 507 [21 P. 961] [" 'the learned counsel may not have had *time* to prepare a *short* brief' "]), but the difference does mean that appellate counsel will have much more freedom to explore the contours and implications of the respective legal positions of the parties. Part of that exploration may mean additional research that trial counsel simply will not have had the time to do.

Finally, because the orientation in appellate courts is on whether the trial court committed a prejudicial error of law, the appellate practitioner is on

occasion likely to stumble into areas implicating some of the great ideas of jurisprudence, with the concomitant need for additional research and analysis that takes a broader view of the relevant legal authorities. The instant case is a perfect example, involving as it does the complex interrelationship between the parol evidence rule and the statute of frauds, and the limits placed by the statute of frauds on the concept of incorporation by reference.

The upshot of these considerations is that appellate practice entails rigorous original work in its own right. The appellate practitioner who takes trial level points and authorities and, without reconsideration or additional research, merely shovels them in to an appellate brief, is producing a substandard product.[7] Rather than being a rehash of trial level points and authorities, the appellate brief offers counsel probably their best opportunity to craft work of original, professional, and, on occasion, literary value. Ahmad's appellate counsel's notion that opposing appellate counsel's task was merely to "simply change the trial points and authorities into an appellate format" is not well taken.

*In re Marriage of Hall* (2000) 81 Cal.App.4th 313 [96 Cal.Rptr.2d 772], relied on by Ahmad for the proposition that the trial court was sua sponte obligated to state the reasons for a given attorney fee award on the record in open court, is inapposite, though Ahmad's general point—that family court rulings should be explained to the parties in such a way that they can understand why the judge ruled the way he or she did—is well taken. *Hall*, however, involved a child support order where the relevant statutory language left the trial court with no choice but to explain the order on the record. While the members of this panel might, if we were in the Legislature, favor amending the attorney fee award statutes to require an explanation in open court, there is no such statutory requirement now. The closest thing is the requirement that the trial court provide a statement of decision in certain circumstances.[8]

Ahmad further claims that $22,000 of the $55,000 award represents what were, in effect, sanctions given without proper notice under Family Code section 271. He bases this contention on the trial judge's having stated on the record that $22,000 of the fee award was for "extraordinary" work prompted

---

[7]"Substandard," however, does not necessarily mean "below the applicable standard of care." No doubt many appeals have been financed on a well-worn shoestring, where counsel would gladly have done additional work, but the client simply couldn't afford it. But low level work should hardly be treated as the norm.

[8]Ahmad's motion for this court to take judicial notice of certain documents in the ·trial court's file concerning a request he made for a statement of decision is granted. Even so, it makes no difference because in none of his opening briefs does he argue that he was denied a statement of decision that he was otherwise *entitled* to.

by "the issue of the marital contract and the nullity." (The reference to "nullity" was to Ahmad's having initially taken the position that the marriage should be annulled.) By no stretch of the imagination, however, can the figure be construed in the context of this case as a "sanction" under section 271. As this opinion has, we hoped, demonstrated, the "marital contract" issue was indeed an "extraordinary" one, justifying additional work by Sherifa's counsel. And while we have not had to deal with the merits of the "nullity" issue in this appeal, suffice to say that it was not ipso facto so fatuous that we are *compelled* to ascribe any extra fees that it might have caused Sherifa to incur to the category of "sanctions" either.

The other and smaller $2,500 attorney fee award was also within the bounds of the trial court's discretion. The award was made to reimburse Sherifa for her attorney fees in opposing a motion brought by Ahmad to modify the judgment regarding a particular asset. Again, it wasn't a "sanction order" under section 271 of the Family Code as Ahmad claims. It was, like the fee award for this appeal, a garden-variety order under sections 2030 and 2032 of the Family Code to allow the cash poor party the means to litigate.

### DISPOSITION

The judgment and the two orders challenged in this appeal are affirmed. Sherifa will recover her costs on appeal.

Rylaarsdam, J., and Moore, J., concurred.

A petition for a rehearing was denied May 9, 2001, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied July 11, 2001.